1  STEPHAN C. VOLKER (CSB #63093)
   ALEXIS E. KRIEG (CSB #254548)
2  STEPHANIE L. CLARKE (CSB #257961)
   JAMEY M.B. VOLKER (CSB #273544)
3  LAW OFFICES OF STEPHAN C. VOLKER
   1633 University Avenue
4  Berkeley, California 94703
   Tel:   510/496-0600
5  Fax:   510/845-1255

6
   Attorneys for Plaintiffs
7  BACKCOUNTRY AGAINST DUMPS,
   DONNA TISDALE, and JOE E. TISDALE
8

9              IN THE UNITED STATES DISTRICT COURT

10           FOR THE EASTERN DISTRICT OF CALIFORNIA

11  BACKCOUNTRY AGAINST DUMPS,        ) Civ. No. TO BE ASSIGNED
    DONNA TISDALE, and JOE E. TISDALE, )
12                                      )
13               Plaintiffs,            )
                                        )  **COMPLAINT FOR**
14         vs.                          )  **DECLARATORY AND**
                                        )  **INJUNCTIVE RELIEF**
15  UNITED STATES BUREAU OF INDIAN     )
    AFFAIRS, DARRYL LACOUNTE, in his    )
16  official capacity as Director of the United )
    States Bureau of Indian Affairs, AMY )
17  DUTSCHKE, in her official capacity as )
    Regional Director of the Pacific Region of )
18  the United States Bureau of Indian Affairs, )
    UNITED STATES DEPARTMENT OF THE    )
19  INTERIOR, DAVID BERNHARDT, in his   )
    official capacity as Secretary of the Interior, )
20  and TARA SWEENEY, in her official    )
    capacity as Assistant Secretary of the Interior )
21  for Indian Affairs,                  )
                                        )
22               Defendants.            )
    _____ )

23
24                    **INTRODUCTION**

25       1.    On May 12, 2020, the United States Bureau of Indian Affairs ("BIA")

26  published notice of its April 7, 2020 Record of Decision ("ROD") authorizing the

27  issuance of a 25-year lease of land (with a possible 13-year extension) ("Land Lease")

28  between the Campo Band of Diegueño Mission Indians ("Tribe") and Terra-Gen

    Development Company LLC ("Terra-Gen"), allowing Terra-Gen to develop, construct,

operate, and maintain renewable energy generation facilities on land within the Tribe's

Reservation boundaries (the "Project"). However, this Project will cause significant

environmental harms to tribal members and the surrounding community, and BIA failed

to address those harms fully and fairly as required by applicable environmental laws.

2. The Project includes both the Campo Wind Facilities on the Reservation, and

the Boulder Brush Facilities on adjacent private lands. The Campo Wind Facilities would

be located within a 2,200 acre corridor on the Tribe's Reservation, and consist of sixty

586-foot tall turbines, three 374-foot meteorological towers, 15 miles of new access

roads, an electrical connection and communication system, a collector substation, an

operation and maintenance facility, a gen-tie line, and other components needed for

construction and operation. The Boulder Brush Facilities on 320 acres of private land

adjacent to the Reservation would include a substation, gen-tie line, switchyard, and

access roads. The Boulder Brush Facilities are under the County of San Diego's land use

and permitting jurisdiction, and would require a Major Use Permit from the County.

3. Plaintiffs BACKCOUNTRY AGAINST DUMPS, DONNA TISDALE, and

JOE E. TISDALE (collectively, "Plaintiffs") challenge the approval of the Project by

defendants UNITED STATES BUREAU OF INDIAN AFFAIRS, DARRYL

LACOUNTE, in his official capacity as Director of the United States Bureau of Indian

Affairs, AMY DUTSCHKE, in her official capacity as Regional Director of the Pacific

Region of the United States Bureau of Indian Affairs, UNITED STATES

DEPARTMENT OF THE INTERIOR, DAVID BERNHARDT, in his official capacity as

Secretary of the Interior, and TARA SWEENEY, in her official capacity as Assistant

Secretary of the Interior for Indian Affairs (collectively, "BIA") for violations of the

National Environmental Policy Act ("NEPA"), 42 U.S.C. section 4321 *et seq*., the

Migratory Bird Treaty Act ("MBTA"), 16 U.S.C. section 703 *et seq*., the Bald Eagle and

Golden Eagle Protection Act ("Eagle Act"), 16 U.S.C. section 668, and the

Administrative Procedure Act ("APA"), 5 U.S.C. sections 701-706, and regulations

promulgated thereunder.

4.    The Project is a dangerous and completely unnecessary industrialization of high quality wildlife habitat in an area with an extremely high wildfire risk and frequent low-flying military, commercial and private aircraft.  The Project poses grave threats to birds and other wildlife, to aviation safety, to human health and safety from excessive noise–especially infrasound and low frequency noise ("ILFN")–and to public safety from catastrophic wildfires.  Far less harmful and more efficient energy development solutions exist, such as distributed (*i.e.* small scale and localized) generation projects near energy demand centers in already-disturbed areas (such as roof-top solar arrays), or much smaller, reduced-capacity turbines.

5.    Wind power is widely perceived to be an ecologically safe and reliable renewable energy source, but in truth, it is anything but.  Unlike roof-top solar power that eliminates environmental harm due to its small scale and proximity to its place of use, wind power is unsafe, unreliable and environmentally destructive.  Much as hydroelectric dams were once thought to be environmentally benign, but are now known to block salmon, waste water from evaporation, harm downstream habitat by releasing warm water, fill with sediment, and pose safety risks from leaks, earthquakes and poor foundation design and construction, and just as nuclear energy was initially promoted as safe and reliable but is now known to be neither, so too wind power has not withstood careful scrutiny.  Its 230-foot long, 40-ton, 200-mph spinning blades kill birds and bats much like a giant vacuum in the sky.  Its 50- to 75-ton nacelles (rotors) overheat and spew flaming debris, causing wildfires.  Its unrelenting, pulsating whooshing noise emits infrasound and low-frequency sound waves that harm human health and disturb sleep for miles.  Its ridge-top towers and power lines prevent aerial firefighting.  Its enormous blade sweep poses aviation hazards because tower lights are hundreds of feet below the blade tips.  Each day when the sun rises and sets, its swirling blades cause blinding shadow flicker.  When its blades break, they fly through the sky, pointed-end over jagged-end, posing extreme safety hazards to homes, cars and people alike.  And, due to uncertain winds and frequent breakdowns, on average its wind capacity factor (the

amount of energy actually produced over a year as a fraction of the turbines' rated maximum capacity) is only about 30 percent. Unlike roof-top solar, it lacks any battery storage capacity and thus requires augmentation from other, often fossil fuel, energy sources. And, unlike solar panels, which are increasingly American made, virtually all wind turbines–like the ones in this Project–are built overseas and provide no manufacturing jobs here at home.

6. BIA's Project approvals violate NEPA in several significant respects. In its Final Environmental Impact Statement ("FEIS"), BIA (1) unlawfully segmented the analysis of connected actions (40 C.F.R. §1508.25(a)(1)); (2) failed to consider all cumulative projects (40 C.F.R. §1508.7); (3) failed to evaluate a reasonable range of alternatives (42 U.S.C. §4332; 40 C.F.R. §1502.14);(4) failed to take a "hard look" at, provide a "full and fair discussion" of, and provide sufficient evidentiary support for its conclusions regarding, the environmental impacts of the Project (40 C.F.R. §1502.1); and (5) impermissibly deferred specification and analysis of the myriad mitigation measures on which the FEIS relies until after the completion of environmental review.

7. BIA violated the MBTA by failing to require a takings permit for the Project under the MBTA and its regulations to assure that the foreseeable deaths of migratory birds are avoided to the extent possible.

8. BIA violated the Eagle Act by failing to require a takings permit for the Project under the Eagle Act and its regulations to assure that the foreseeable deaths of golden eagles are avoided to the extent possible.

9. BIA violated the APA by approving the Project without complying with the foregoing environmental laws.

10. Accordingly, Plaintiffs seek orders from this Court: (1) granting preliminary injunctive relief restraining BIA from taking any action that would result in any change to the physical environment in connection with the Project pending a full hearing on the merits; (2) declaring that BIA violated NEPA in the respects alleged herein; (3) declaring that BIA violated the MBTA by failing to secure or require a takings permit under that

statute to minimize the foreseeable deaths of migratory birds; (4) declaring that BIA violated the Eagle Act by failing to secure or require a takings permit under that statute to minimize the foreseeable deaths of golden eagles; (5) declaring that BIA violated the APA by failing to comply with NEPA, the MBTA and the Eagle Act; and (6) granting permanent injunctive relief overturning BIA's Project approvals pending BIA's compliance with NEPA, the MBTA, the Eagle Act, and the APA.

## JURISDICTION AND VENUE

11. The Court has jurisdiction over this action under 28 U.S.C. sections 1331 (federal question), 1337 (regulation of commerce), 1346 (United States as defendant), 1361 (mandamus against an officer of the United States), 2201 (declaratory judgment) and 2202 (injunctive relief), and under the APA, 5 U.S.C. sections 701-706 (review of final agency action), because (1) the action arises under the APA, and NEPA; (2) BIA is an agency of the United States government and the individual Defendants are sued in their official capacities as officers of the United States; (3) the action seeks a declaratory judgment voiding BIA's Project approvals; and (4) the action also seeks further injunctive and mandamus relief until BIA complies with applicable law.

12. Venue is proper in this judicial district pursuant to 28 U.S.C. section 1391(e)(2) because BIA and one or more individual Defendants officially reside in this judicial district.

13. There exists now between the parties an actual, justiciable controversy in which Plaintiffs are entitled to have a declaration of their rights, a declaration of BIA's obligations under NEPA, and further relief because of the facts and circumstances hereinafter set forth.

14. This Complaint is timely filed within the applicable six-year statute of limitations set forth in 28 U.S.C. section 2401(a).

15. Plaintiffs have standing to assert their claims because they use or otherwise enjoy, or reside in close proximity to or adjacent to the lands on which the Project would be built, and would be harmed by the impacts of the Project's construction and operation

on Plaintiffs' recreational, wildlife, cultural, scientific, spiritual, aesthetic, safety and property interests. Plaintiffs have exhausted all applicable remedies by commenting on and objecting to the Project before its approval.

## PARTIES

16. Plaintiff BACKCOUNTRY AGAINST DUMPS ("Backcountry") is a community organization comprising numerous individuals and families residing in eastern San Diego County and Imperial County who will be directly affected by the Project and its connected actions. Backcountry and its members are vitally interested in proper land use planning and management in order to maintain and enhance the area's ecological integrity, scenic beauty, wildlife, recreational amenities, and natural resources. Backcountry's members use the area affected by the Project for aesthetic, scientific, historic, cultural, recreational, and spiritual enjoyment. Construction and operation of the Project threatens to harm the use and enjoyment of these public resources by Backcountry's members as well as the public at large. The Project also threatens to cause physical and psychological harm to Backcountry's members and other nearby residents through its emission of excessive audible noise and ILFN, and its adverse impacts to visual resources. Backcountry therefore seeks this Court's review and invalidation of BIA's Project approvals.

17. Plaintiff DONNA TISDALE lives on Morningstar Ranch, located two miles west of Tierra Del Sol Road in Boulevard, California, and adjacent to the Tribe's Reservation. She is a member of Backcountry, as well as the Chairwoman of San Diego County's Boulevard Planning Group. Ms. Tisdale's ranch shares a half-mile border with the Reservation and is adjacent to the Project site. The ranch includes a barn/shop, and three homes. Ms. Tisdale and her husband reside in one of the homes and use the other two homes as rental properties. Ms. Tisdale currently uses and intends to continue to use her ranch for these purposes, as well as for activities such as hiking, family gatherings, recreation, wildlife and wildflower viewing, photography, star gazing and quiet meditation. Construction and operation of the Project will harm Ms. Tisdale's use and

enjoyment of her ranch and the surrounding natural resources, and will diminish her lifetime investment in her property. Ms. Tisdale therefore seeks this Court's review and invalidation of BIA's Project approvals.

18. Plaintiff JOE E. TISDALE lives with his wife Donna Tisdale on Morningstar Ranch, located two miles west of Tierra Del Sol Road in Boulevard, California, and adjacent to the Tribe's Reservation. He is a member of Backcountry. Mr. Tisdale purchased Morningstar Ranch in 1963. Mr. Tisdale's ranch shares a half-mile border with the Reservation and is adjacent to the Project site. The ranch includes a barn/shop, and three homes. Mr. Tisdale and his wife reside in one of the homes and use the other two homes as rental properties. Mr. Tisdale currently uses and intends to continue to use his ranch for these purposes, as well as for activities such as hiking, family gatherings, recreation, wildlife and wildflower viewing, photography, star gazing and quiet meditation. Construction and operation of the Project will harm Mr. Tisdale's use and enjoyment of his ranch and the surrounding natural resources, and will diminish his lifetime investment in his property. Mr. Tisdale therefore seeks this Court's review and invalidation of BIA's Project approvals.

19. Plaintiffs' injuries are fairly traceable to BIA's actions. Construction and operation of the Project and connected actions will harm Plaintiffs' use of the Project area for recreational activities including natural and cultural study, wildlife and wildflower viewing, scenic enjoyment, photography, hiking, family outings, star gazing and meditation. These injuries are actual, concrete, and imminent. Plaintiffs have no plain, speedy, or adequate remedy at law. Accordingly, Plaintiffs seek injunctive, mandamus, and declaratory relief from this Court to rectify BIA's unlawful acts and redress Plaintiffs' injuries.

20. Defendant UNITED STATES BUREAU OF INDIAN AFFAIRS ("BIA") is an agency of the United States government charged by statute with responsibility for reviewing and approving the Project as it is located on Reservation lands owned and managed by BIA for the benefit of the Tribe.

21.     Defendant DARRYL LACOUNTE is sued in his official capacity as Director of BIA because he exercises responsibility over management of lands owned and managed by BIA including the Reservation in which the Project is proposed to be built and operated, and in that capacity Mr. LaCounte purported to approve the Project.

22.     Defendant AMY DUTSCHKE is sued in her official capacity as Regional Director of BIA because she exercises responsibility over management of lands owned and managed by BIA including the Reservation on which the Project is proposed to be built and operated, and in that capacity Ms. Dutschke purported to recommend approval of the Project.

23.     Defendant UNITED STATES DEPARTMENT OF INTERIOR ("DOI") is the federal agency charged with managing most of the nation's federally owned lands, including the Project site.  DOI is also charged with ensuring compliance with applicable laws, including but not limited to NEPA, the MBTA the Eagle Act, and the APA, in its management of those lands.

24.     Defendant DAVID BERNHARDT is sued in his official capacity as Secretary of the Interior because he exercises responsibility over management of lands owned and managed by BIA including the Reservation on which the Project is proposed to be built and operated, and in that capacity Mr. Bernhardt purported to approve the Project through delegated authority exercised by the Assistant Secretary of the Interior for Indian Affairs, Tara Sweeney.

25.     Defendant TARA SWEENEY is sued in her official capacity as Assistant Secretary of the Interior for Indian Affairs.  In that capacity, Ms. Sweeney purported to approve the Project by signing a ROD and related authorizations including approval of the FEIS, all allowing construction and operation of the Project, on or about April 8, 2020, although the approvals were not released to the public until on or about May 12, 2020.

## BACKGROUND

26.     As approved by the BIA in its ROD, the Project is slated to be constructed on

2,200 acres of land located within the Tribe's 16,512-acre Reservation near the rural community of Boulevard in eastern San Diego, approximately 70 miles east of the City of San Diego. ROD 1. The proposed wind energy generation facility includes up to sixty 586-foot tall turbines, three 374-foot tall meteorological towers, 15 miles of new access roads, an electrical connection and communications system, a collector substation, an operation and maintenance facility, a generator-tie ("gen-tie") line, and other components needed for construction and operation of the Project. FEIS at 6-11. The Project would have an electrical generation capacity of up to 252 megawatts ("MW"). ROD 1.

27. The Project also includes the closely related Boulder Brush Facilities on 320 acres of private land adjacent to the Reservation which would include an approximately 3.5-mile Off-Reservation portion of the gen-tie line, a high-voltage substation, a 500 kilovolt ("kV") switchyard and connection, and access roads. FEIS at 11-14. The Boulder Brush Facilities are subject to the land use and permitting jurisdiction of the County of San Diego, and require a Major Use Permit from the County. FEIS at 5.

28. Also included in the Project, among other components, are temporary construction facilities: a 20-acre parking and staging area, sixty 1.9-acre construction laydown areas, and a massive, noisy and dusty concrete batch plant (with cement storage silos) that would occupy 3.7 acres and measure about 400 feet on each side. FEIS at 10, 16, 19. In addition, groundwater wells would have to be drilled in order to supply the Project with water during both construction and operation. In total, Project construction is expected to take 14 months to complete. ROD 7.

29. BIA prepared a Draft Environmental Impact Statement ("DEIS") in May 2019 and a FEIS on February 10, 2020, and purported to rely on those documents in approving the Project. Plaintiffs had submitted timely scoping comments on the Project on December 21, 2018, timely comments on the DEIS on July 8, 2019 and timely comments on the FEIS on March 11, 2020, which raised pertinent objections to the Project. Plaintiffs had also submitted other relevant comments to BIA identifying legal deficiencies in its review of the Project prior to BIA's approval of the ROD on or about

1  April 7, 2020 and public notification of that approval on or about May 12, 2020.

2      30.    Plaintiffs also submitted timely comments to San Diego County objecting to

3  its review and approval of the Project and the related Boulder Brush Facilities.

4      31.    In this lawsuit, Plaintiffs challenge BIA's Project approvals and associated

5  environmental review under NEPA, the MBTA, the Eagle Act, and the APA.

6  **FIRST CLAIM FOR RELIEF**

7  (Violation of the National Environmental Policy Act)

8  (Against All Defendants)

9      32.    The paragraphs set forth above and below are realleged and incorporated

10  herein by reference.

11  **The FEIS Unlawfully Segments the Analysis of Connected Actions**

12      33.    NEPA forbids "segmented" environmental review.  40 C.F.R.

13  §1508.25(a)(1).  Connected actions must be considered together in a single EIS.  *Thomas*

14  *v. Peterson*, 753 F.2d 754, 759 (9th Cir. 1985) (overruled on other grounds by

15  *Cottonwood Environmental Law Center v. U.S. Forest Service*, 789 F.3d 1075, 1088-

16  1092 (9th Cir. 2015)).  Connected actions are those that (1) "[a]utomatically trigger"

17  other actions, (2) "cannot or will not proceed unless other actions are taken previously or

18  simultaneously," or (3) are "interdependent parts of a larger action and depend on the

19  larger action for their justification."  40 C.F.R. §1508.25(a)(1).  The second and third

20  categories apply to the Project, since it would "share[] a high-voltage substation and

21  switchyard . . . that would be used to connect both [the Project and the connected Torrey

22  Wind Project] to the existing Sunrise powerlink transmission line."  FEIS at RTC-9.

23  Without this interconnection, the Project could not proceed.

24      34.    Actions do not lose their "connected" status just because they are proposed

25  by a different project applicant.  *Alpine Lakes Protection Society v. U.S. Forest Service*,

26  838 F.Supp. 478, 482 (W.D. Wash. 1993).

27      35.    Here, the FEIS improperly segments the analysis of connected actions in at

28  least two ways.

36.     First, the FEIS fails to analyze the impacts of the connected Torrey Wind Project, instead considering it only a cumulative action.  FEIS at RTC-10.  The Torrey Wind Project is a proposed 30-turbine, 126-MW wind energy generation facility that is interdependent with the Boulder Brush component of the Project.  The FEIS acknowledges that the Boulder Brush project and the Torrey Wind Project "do propose to share a high-voltage substation and switchyard on private lands that would be used to interconnect both projects to the existing Sunrise Powerlink transmission line."  FEIS at RTC-9.  However, the FEIS erroneously claims that "the Torrey Wind Project is not a connected action because it would not be triggered by the Project and because the Project is not dependent on the Torrey Wind Project to proceed."  FEIS at RTC-9.  But it simultaneously admits that the Boulder Brush Project's "high-voltage substation would allow for the receiving and stepping up of electric energy from 230 kV to 500 kV for the Torrey Wind Project," and, as noted above, the Boulder Brush Project is, in turn, an integral component of the Campo Wind Project.  FEIS at B-12.  Because the Torrey Wind Project would not proceed as planned without the approval and construction of the Boulder Brush facilities, and the Boulder Brush Project would be dependent on a high-voltage substation and switchyard that would be shared with the Torrey Wind Project, the Torrey Wind Project is connected to the Campo Wind Project.  Therefore, its impacts must be analyzed together in the same document.

37.     Second, while the FEIS acknowledges that the Project "consists of both the Campo Wind Facilities on land within the Reservation and the Boulder Brush Facilities which are located on adjacent private lands within the Boulder Brush Boundary," it fails to fully analyze the impacts from and alternatives to the Boulder Brush transmission, substation and switchyard facilities currently being considered for approval by San Diego County (PDS2018-MPA-18-016).  The FEIS admits that "the Boulder Brush Facilities include an approximately 3.5-mile Off-Reservation portion of the gen-tie line, a high-voltage substation, a 500 kV switchyard and connection," as well as other components, yet it fails to reconcile this dispositive fact with its failure to analyze the impacts of these

clearly connected components. FEIS at RTC-8. The FEIS concedes that "the term "Project Site" refers to the combined Campo Corridor and Boulder Brush Corridor, within which all Project facilities would be constructed and/or operated . . . [and] 'Project Area' is used to describe a broader area potentially affected by the Project alternatives and is generally consistent with the Reservation Boundary and Boulder Brush Boundary." FEIS at RTC-8. However, the bare inclusion of these areas in the Project's definition does not extend to actual analysis of the impacts from the Boulder Brush components. Nor does the FEIS consider specific alternatives to the Boulder Brush transmission facilities; instead, it only briefly summarizes generic alternatives to the form, capacity and location of electrical generation in general. FEIS at 24-26. In response to Plaintiffs' comments on the DEIS requesting full analysis of the Boulder Brush facilities and alternatives thereto as NEPA requires, BIA failed to add any new alternatives to the FEIS, and its response to comments does not even address this omission. FEIS at 24-26, RTC-7 to RTC-9.

**The FEIS Fails to Consider All Cumulative Projects**

38. NEPA requires analysis of cumulative impacts. 40 C.F.R. §1508.7. Yet the FEIS ignores numerous reasonably foreseeable projects that would contribute to the Project's cumulative impacts, including the Energia Sierra Juarez Phase II project in Mexico (only the existing Phase I project is considered), the 90-MW Starlight Solar project near Boulevard and the 50-MW Tecate Solar Hybrid project also in the Boulevard area. FEIS at 140-142, N-1 to N-14. Without any supporting evidence, the FEIS baldly asserts that these projects need not be considered because they are outside the modest area that was considered, despite their obvious cumulative impacts. FEIS at RTC-14. The FEIS ignores the fact that the artificial boundaries it drew around the small area it considered exclude numerous nearby projects. Each of these projects has broad-ranging effects that plainly add to the Project's impacts. Their impacts include widespread effects on wildlife and its habitat, on wildfire risk, on groundwater levels, and on visual resources. The cumulative impacts discussion in Appendix N is likewise deficient

because it does not identify these omitted projects, much less address their effects, nor include a map of the cumulative projects that were considered, let alone their impact areas. FEIS at N-1 to N-14. Although Plaintiffs' comments on the DEIS identified this deficiency, the FEIS entirely fails to address it. FEIS at RTC-13 to RTC-14, RTC-174.

**The FEIS Fails to Evaluate a Reasonable Range of Project Alternatives**

39. The alternatives analysis "is the heart of the environmental impact statement." 40 C.F.R. §1502.14. NEPA requires that an EIS "[r]igorously explore and objectively evaluate all reasonable alternatives" so that "reviewers may evaluate their comparative merits." 42 U.S.C. §4332; 40 C.F.R. §1502.14. Alternatives should be wide-ranging and not exclude options just because they require other agency approvals. *Sierra Club v. Lynn*, 502 F.2d 43, 62 (5th Cir. 1974). Agencies may decline to study an alternative in detail on the grounds that it is "similar to alternatives actually considered, or . . . infeasible, ineffective, or inconsistent with the basic policy objectives for the management area," but only after providing a "reasoned explanation *in the EIS* for its rejection." *Northern Alaska Environmental Center v. Kempthorne*, 457 F.3d 969, 978 (9th Cir. 2006) (first quote; internal quotations and citation omitted); *Southeast Alaska Conservation Council v. Federal Highway Administration* ("*SEACC*"), 649 F.3d 1050, 1059 (9th Cir. 2011) (second quote; emphasis added). "The existence of a viable but unexamined alternative renders an environmental impact statement inadequate." *Alaska Wilderness Recreation & Tourism Ass'n v. Morrison* ("*Alaska Wilderness*"), 67 F.3d 723, 729 (9th Cir. 1995).

40. Here, the FEIS evaluates an artificially and unduly limited range of alternatives. It only evaluates two action alternatives: (1) a 252-MW capacity wind energy facility with sixty 4.2-MW, 586-foot (ground to blade tip) tall wind turbines, and (2) a 202-MW capacity wind energy facility with forty-eight 4.2-MW turbines. FEIS at 24. BIA eliminated from detailed consideration in the FEIS a mixed renewable generation (wind and solar) alternative, a minimal build-out (63-MW capacity) alternative, an off-Reservation location alternative, a reduced-capacity turbine (2.5-MW

turbine) alternative, and a distributed generation alternative.  FEIS at 25-26.

41.    As BIA acknowledges, it is required to "describe any alternative eliminated from further analysis *along with the rationale for elimination*."  FEIS at RTC-12 (citing BIA NEPA Guidebook, §8.4.6, emphasis added).  But BIA failed to provide a "reasoned explanation *in the EIS* for its rejection" of those additional alternatives.  *SEACC*, 649 F.3d at 1059 (emphasis added).  And its response to comments on the DEIS does not provide any further explanation about why the alternatives that were eliminated from analysis were deemed infeasible.   FEIS at RTC-11 to RTC-13.  For example, the FEIS fails to list any "scientific [or] other sources relied upon" for its assertion that the "distance and cost of connecting the scaled down [minimal build-out] project to the planned switchyard would be cost prohibitive and the delivered cost of energy from 15 turbines would be too expensive for a potential buyer to enter into a contract for such a scaled-down project based on current energy market conditions."  40 C.F.R. § 1502.24 (first quote); FEIS at 25 (second quote).  And BIA's reference to the DEIS' statement that "the minimal buildout alternative would be economically infeasible because . . . the costs" would outweigh the "revenue in current market conditions . . . and would not support the purpose of economic benefit to the Tribe," is likewise devoid of any scientific or other source material to support that claim.  FEIS at RTC-174.

42.    The FEIS cannot remedy the DEIS' failures by simply referring back to statements made in the DEIS.  BIA must provide facts and figures to support its conclusion before eliminating a viable, and more environmentally friendly alternative. The FEIS similarly fails to support its rationale for rejecting the reduced-capacity turbines alternative:  that the "[i]mpacts to the environment would have been similar to those of the larger capacity turbines considered in Alternative 1."  FEIS at 25.  Rather, BIA again makes a circular argument:  It refers back to its unsupported statement in the DEIS as support for that same unsupported statement in the FEIS.  FEIS at RTC-175.  But neither the DEIS nor the FEIS provides evidence  "that the reduced capacity turbines would not appreciably reduce impacts."  FEIS at RTC-175.

43.     The fact that reduced-capacity turbines would also require the "same number of turbine pads," while relevant to certain types of impacts, is irrelevant to others.  For example, noise would likely be reduced with lower-capacity turbines (because smaller turbines are quieter), as would public health and safety impacts (because of reduced noise, reduced aviation hazards due to shorter towers,  and reduced wildfire risk due to smaller and lighter nacelles less likely to burn out), avian impacts (because the blade sweep area would be smaller), and visual impacts (because the turbines and their supporting towers would be smaller and therefore less visually intrusive).[1]

44.     NEPA requires that an EIS "[r]igorously explore and objectively evaluate all reasonable alternatives" so that "reviewers may evaluate their comparative merits."  40 C.F.R. §1502.14; 42 U.S.C. §4332; *City of Carmel-by-the-Sea v. United States Dept. of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997).  Analyzed alternatives should be wide-ranging and include options that may require additional approvals or participation by others.  *Sierra Club v. Lynn*, 502 F.2d at 62; *see also* 40 C.F.R. §1502.14(c).  "The existence of a viable but unexamined alternative renders an environmental impact statement inadequate."  *Alaska Wilderness*, 67 F.3d at 729.

45.     Here, BIA unacceptably eliminated from detailed review feasible – and environmentally less damaging – alternatives such as the distributed generation alternative even though they would meet the general Project objective of increasing renewable energy development pursuant to state and federal renewable energy policies.  FEIS at 2, 26.

46.     The FEIS describes the distributed generation alternative as follows:  "a

---

[1] *See*, *e.g.*, Walker, Bruce, George F. and David M. Hessler, Rob Rand & Paul Schomer, December 24, 2012, "A Cooperative Measurement Survey and Analysis of Low Frequency and Infrasound at the Shirley Wind Farm in Brown County, Wisconsin," Public Service Commission of Wisconsin Report #122412-1 (attached as Exhibit 1 to Backcountry's July 8, 2019 DEIS Comments) (noting that the "Navy's prediction of the nausogenic region . . . indicates a 6 dB decrease in the criterion level for a doubling of power such as from 1.25 MW to 2.5 MW).

variety of technologies that generate electricity at or near where that electricity would be used, such as solar panels and small wind turbines." FEIS at 26.

47. The FEIS acknowledges that "[w]hen connected to the electric utility's lower-voltage distribution lines, distributed generation can help support delivery of power to additional customers and reduce electricity loss along transmission and distribution lines." *Id*. Nevertheless, the FEIS dismisses the distributed generation alternative on the grounds that it "would have to be located primarily at Off-Reservation locations to generate the same approximate amount of energy that would be produced by the Project." *Id*. The FEIS therefore eliminated distributed generation from analysis because "it would not provide benefits to the Tribe and would be outside of the Tribal governance." *Id*. But the FEIS must "[r]igorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. §1502.14(a). Distributed generation is feasible, cost-effective and would meet state and federal renewable energy goals. Therefore, it is reasonable and must be considered in detail.

48. Distributed generation will provide ample renewable energy. Currently, the city of San Diego is one of the top producers of distributed solar in the country. If current rates of installation continue in SDG&E's service area, distributed generation could "generate the same approximate amount of energy that would be produced by the Project." FEIS at 26. And there is significantly more distributed generation potential with non-photovoltaic solar sources, such as combined heat and power plants. These plants have the potential to provide almost 400 megawatts of cost-effective energy generation. Combined, these and other distributed generation sources could easily meet renewable energy goals. This would be even more readily achievable if a portion of the considerable funds, expertise and efforts going into developing remote industrial-scale renewable energy projects like the Campo Wind Project were redirected to distributed generation projects and research.

49. Distributed generation, such as PV solar and combined heat and power, is also commercially viable now and becoming increasingly cost-effective. Indeed,

distributed PV systems are already less expensive than some remote industrial-scale renewable energy projects, and they are predicted to soon become more affordable than most land-based wind energy systems on both a per-kW-installed and levelized-cost-of-electricity basis. They also *already* create nearly *three times* more permanent jobs than wind energy projects for every peak MW added. In likely recognition of this trend, many utility-scale renewable energy project developers themselves agree that distributed generation is the future of renewable energy power.

50.     BIA's failure to fully analyze a distributed generation alternative violated NEPA.

## BIA Failed to Take a Hard Look at the Project's Impacts in the FEIS

51.     NEPA requires that agencies take a "hard look" at the environmental impacts of proposed major federal actions and provide a "full and fair discussion" of those impacts in an EIS. 40 C.F.R. §1502.1; *National Parks and Conservation Assn v. BLM*, 606 F.3d 1058, 1072-1073 (9th Cir. 2010); CEQA Guidelines §15126.2(a) ("Direct and indirect significant effects of the project on the environment shall be clearly identified and described"); *National Parks & Conservation Assn v. Babbitt*, 241 F.3d 722, 733 (9th Cir. 2001). That includes "insur[ing] the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements" by "identify[ing] any methodologies used and . . . mak[ing] explicit reference by footnote to the scientific and other sources relied upon for conclusions in the statement." 40 C.F.R. §1502.24. Here, BIA failed to take a hard look at numerous Project impacts.

### A.  Impacts to Biological Resources

52.     The FEIS significantly downplays the Project's biological impacts on numerous species. By understating these impacts, the FEIS fails to accurately inform the public and decisionmakers of the Project's environmental harm, in violation of NEPA.

//

//

//

**1. Golden Eagles and Other Avian Species**

53.     Wind turbines kill birds.[2]  The Campo Wind Project's 60 turbines will be no different.  A wealth of bird species has been documented inhabiting or otherwise using the Project area, including sensitive species like golden eagles.  FEIS Appendix F.  The risk to golden eagles is particularly concerning because they are "currently known to be at risk of *population-level* effects from [wind turbine] collisions," and must be afforded every possible protection.  Plaintiffs' July 8, 2019 Comments, Exhibit 2 at 306.  Yet the FEIS brushes aside the risk to golden eagles because "[e]agle use on site is infrequent and the chance for collisions is low."  FEIS at 88.  It also dismisses collision impacts to other migratory birds (protected under the MBTA) because the Project would implement a hypothetical "Bird and Bat Conservation Strategy ("BBCS")" to be developed by Terra-Gen to monitor, report and notify a Project biologist about dead or injured birds and bats.  FEIS at 88; FEIS Appendix P at 5-6.

54.     But not one of the specific suggested components of the BBCS listed in FEIS Appendix P would actually reduce bird collisions or mitigate their impacts on birds.  *Id*.  Instead, all of them merely suggest ways to monitor and report bird collisions and deaths *after they occur*.  *Id*.  Yet, despite the absence of any actual proposal to reduce bird collisions and deaths, the FEIS still dismisses the Project's impact on birds as less than significant with mitigation.  FEIS at RTC-21.  But if the impact is significant before mitigation, and the mitigation does not lessen the impact–as here–then the impact is still significant after mitigation.  FEIS at 88 (admitting that "Absent mitigation, these direct impacts would be adverse" but simultaneously claiming that with mitigation, "the Project would not result in adverse effects to migratory birds").

55.     The FEIS' vague claims of effective mitigation to reduce bird collisions and

---

[2] Dwyer, J.F., M.A. Landon, and E.K. Mojica, 2018, "Impact of Renewable Energy Sources on Birds of Prey," in J.H. Sarasola *et al.* (eds.), 2018, *Birds of Prey*, Springer International Publishing AG (attached as Exhibit 2 to Backcountry's July 8, 2019 DEIS Comments).

deaths are unsupported and insufficient to reasonably inform decisionmakers and the public for at least four reasons. First, the FEIS fails to *quantify* the number of expected wind turbine collisions with all birds, let alone with any bird species that are particularly at risk. While BIA did complete additional avian surveys to determine the presence of species in the area, it still failed to quantify potential impacts. In the face of the FEIS' admission that "wind turbines were considered to present a potential risk to avian species for collision" (FEIS at RTC-27), BIA's failure to quantify this risk by disclosing the foreseeable range of bird deaths leaves the public guessing.

56.     Yet despite this profound omission, the FEIS nonetheless claims that "there would be no additional impacts anticipated" to avian species. FEIS at RTC-27. But the FEIS may not, consistent with NEPA, draw this conclusion without facts to support it. *State of California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982). And, the record shows that this conclusion does not follow from the facts that *are* available. For example, because the golden eagle *population* is at risk from wind turbines and other causes, as discussed, the loss of one golden eagle could have population-level consequences. But BIA ignores that potentially devastating impact and flatly declares that "there would be no adverse effects on eagles." FEIS at 88.

57.     Second, after-the-fact monitoring of bird collisions and removal of bird carcasses (as proposed as part of Mitigation Measure ("MM")-BIO-4) merely documents the harm *after* it has occurred. It does nothing to mitigate, let alone prevent, the collisions themselves or the resulting bird deaths. FEIS Appendix P at 5-6. Monitoring cannot bring birds back from the dead. BIA's revision of MM-BIO-4 does nothing to lessen the ineffectiveness of that mitigation measure. *Id*. Adding more post-mortem monitoring and notification does not stop the impact from happening in the first place. To the contrary, it just habituates the public to the growing death toll, compounding the unfolding tragedy.

58.     Third, the FEIS fails to analyze the fact that when birds are killed by wind turbines, that mortality impacts both the way birds migrate, and the relative abundance of

open-habitat versus forested habitat species.  The birds that are genetically best able to
lead their flocks on migrations are the ones most likely to be killed, because they are in
the lead when they encounter the turbines.  With their passing, the flocks as a whole are
less likely to migrate well, or at all, leading to population-level declines due to the flocks'
collective inability to timely reach their feeding, breeding and nesting habitats.  Relatedly,
wind turbines disproportionately impact open-habitat birds, as opposed to birds that avoid
open areas.  These impacts are among those categorized by scientists as *the landscape*-
scale avoidance impacts that the Project's turbines would likely cause.[3]  A recent
longitudinal study of bird densities at 12 wind farms in Ireland and their paired control
sites found that "densities of open-habitat species were lower at wind farms" than at the
control sites "independent of distance to turbines."  July 8, 2019 Comments Exhibit 3 at
7.  This "suggests that for open-habitat birds, effects were operating at a landscape scale."
July 8, 2019 Comments Exhibit 3 at 8.  The Campo Wind Project could well have similar
effects.  While some of the bird species inhabiting the Campo Wind Project site may be
different than those at the study sites in Ireland, because the terrain is more "open-
habitat" than "forested," the birds that occupy this habitat are more likely to be vulnerable
to landscape-scale lethal effects.

59.     Fourth, the avian surveys that were completed did not comply with Land-
Based Wind and Eagle Conservation Plan Guidelines.  Those Guidelines call for a
minimum of two years of surveys, across all seasons, and 20 hours of survey per turbine
per year–which would total 2,400 hours for this Project.  But here, these protocols were
not met.  The FEIS admits that the developer and USFWS agreed that the Land-Based
Wind Energy Guidelines and the Eagle Conservation Plan Guidance were the appropriate
methods to be used, and it does not deny that the surveys that were completed failed to

---

[3] Fernández-Bellon, D., M.W. Wilson, S. Irwin, and J. O'Halloran, 2018, "Effects
of Development of Wind Energy and Associated Changes in Land Use on Bird
Densities in Upland Areas," *Conservation Biology* 0(0):1-10 (attached as Exhibit
3 to Backcountry's July 8, 2019 DEIS Comments).

reach 2,400 hours, across all seasons, for two years.

60.   Instead, BIA now claims–contrary to its earlier admission–that the "guidelines referenced . . . are not required . . . under federal law or regulation" and "the methods are flexible." FEIS at RTC-81 (first quote), RTC-92 (second quote), RTC-176. But no amount of flexibility changes the fact that the surveys do not meet the requirements that the developer and USFWS originally said were the best practice and therefore necessary. Furthermore, no eagle nest searches *at all* have been performed since 2011, and the FEIS does not provide any information on the status of eagle breeding territories in the region.

61.   Finally, even if the surveys had been performed, the survey methods cannot be evaluated because survey reports are not included in the FEIS.

62.   In sum, the FEIS' analysis of the Project's impacts to birds fails to reasonably inform decisionmakers and the public as NEPA requires. Its discussion of the Project's impacts on birds must accordingly be declared inadequate under NEPA.

## 2. Quino Checkerspot Butterfly

63.   The Project area provides habitat for the endangered Quino checkerspot butterfly (*Euphydryas editha quino*; "QCB"), as it falls within the La Posta/Campo Core Occurrence Complex for this species. 74 Fed.Reg. 28776-28862 (June 17, 2009). The U.S. Fish and Wildlife Service ("FWS") warns that preservation of these core occurrence complexes is essential to QCB recovery. *Id*. Yet, the Project "would permanently remove 242.1 acres of suitable [QCB] habitat." FEIS at 87. Despite this significant impact, the FEIS devotes less than one page to the Project's effects on the QCB. FEIS at 87. It directs the reader to FEIS Appendix H, but that Appendix never evaluates how this impact affects QCB recovery and survival. FEIS Appendix H at 136, 141. And contrary to NEPA, it ignores rather than addresses FWS' warning.

64.   Appendix H states that "[a]pproximately 1,216 acres were considered potential suitable habitat within the Project Site," contrary to the FEIS' textual claim that only 699 acres within the Project Area were considered suitable habitat. FEIS Appendix

1    H at 77; FEIS at 38.  It also acknowledges that "[c]onstruction activities increase the

2    number of humans within the area, which can deter wildlife from using an area," and that

3    operation and maintenance would cause "fugitive dust from vehicles, habitat

4    fragmentation, accidental additional clearing of adjacent habitat, chemical pollutants if

5    used for operation-related activities, non-native invasive species, and alteration of the

6    natural fire regime."  FEIS Appendix H at 131, 141.  But it never assesses how these

7    admitted incursions into its habitat would impact QCB survival.

8         65.    The FEIS claims it followed FWS guidelines to identify potential habitat, but

9    it never delineates, or cites any source for, that claimed guidance.  BIA asks the public to

10   take its word that "[a]ll survey methods and protocols, species modeling and impact

11   analysis methodologies were conducted in coordination and consultation with [FWS] to

12   ensure adequacy and accuracy."  FEIS at RTC-14.  But without any guidelines or

13   correspondence with FWS to allow independent assessment of these claims, the public is

14   left in the dark.  Furthermore, the FEIS' claim that "the Project would not adversely affect

15   *any* federally listed plants or wildlife, because *none* are present," is demonstrably

16   incorrect, since there were five QCB identified in the 2019 off-reservation surveys of the

17   Project area.  FEIS at 87 (emphasis added).  This is not the "hard look" that NEPA

18   requires.

19        66.    The FEIS also claims that "[b]ecause decommissioning would include

20   restoration of the area to pre-Project conditions, it would ultimately not result in adverse

21   effects on [QCB]."  FEIS at 87.  But the Project will operate–and deprive QCB of their

22   essential habitat– for decades, rendering any attempted restoration thereafter too late to

23   save the QCB from extinction.

24        67.    The FEIS claims that any adverse impacts "would be reduced to less than

25   adverse with implementation of recommended [Mitigation Measures] MM-BIO-1 and

26   MM-BIO-3" (FEIS at 87), but those "measures" are nothing more than one-to-four-word

27   headings–e.g., "revegetation" and "construction fencing and signage"–devoid of any

28   actual text explaining what each measure entails.  FEIS at 90.  As the FEIS admits,

"mitigation [must] be discussed in sufficient detail to ensure that environmental consequences have been fully evaluated." FEIS at RTC-177. For this reason, courts require EISs to describe mitigation measures with enough detail so the public can assess how well they "will serve to mitigate the potential harm" they target. *Foundation for North American Wild Sheep v. U.S. Department of Agriculture*, 681 F.2d 1172, 1181 (9th Cir. 1982) (quote); *South Fork Band Council v. U.S. Department of Interior* ("*South Fork*"), 588 F.3d 718, 727 (9th Cir. 2009). But contrary to this NEPA tenet, the FEIS never provided *any* detail, let alone demonstrated that these "measures" would mitigate the Project's impacts to insignificance. These discrepancies and omissions leave the public guessing as to the Project's impacts to the QCB's survival and recovery.

68. The FEIS downplays the fact the Project would "permanently remove 242.1 acres of suitable Quino checkerspot habitat" by claiming that "[a]dverse effects on the Quino checkerspot and its habitat would be reduced to less than adverse with implementation of recommended MM [Mitigation Measure]-BIO-1 and MM-BIO-3," and that "[t]he Off-Reservation portion of the Project would not adversely affect any federally listed plants or wildlife, because none are present." FEIS at 87. Neither claim is correct.

69. As noted, these "mitigation measures" are nothing more than vague catch phrases devoid of any actual text, let alone substance. FEIS at 90. This is not surprising, since BIA cannot possibly know how to mitigate impacts that it has not yet identified. The FEIS concedes BIA lacks the information it needs to determine the Project's impacts, and is still collecting data notwithstanding publication of the FEIS: "[a]n additional set of Quino checkerspot butterfly surveys are being conducted within the Off-Reservation portion of the Project." FEIS at 87. Without this survey information, BIA cannot determine the Project's impacts and how those unknown impacts would affect the FEIS' analysis.

70. The FEIS' admission that BIA rushed to publish its FEIS before it had completed collection of essential data is consistent with its pattern of claiming "mission accomplished" or "no effect" before actually collecting the data to support these claims.

For example, the FEIS claims that "the Project would not adversely affect any federally listed plants or wildlife, *because none are present.* " FEIS at 87 (emphasis added). But according to its own Biological Technical Report, Appendix H, there were five Quino checkerspot butterflies identified in the 2019 surveys of the Off-Reservation portion of the Project. FEIS Appendix H at 77. The FEIS' claim of "no adverse effect" on this species because "none are present" was at best premature, and at worst, knowingly false.

71. For a second example, the FEIS claims that "[b]ecause decommissioning would include restoration of the area to pre-Project conditions, it would ultimately not result in adverse effects on Quino checkerspot butterfly." FEIS at 87. But eventual restoration to pre-Project conditions–which is not even possible–does not negate the adverse effects that would have occurred during the decades of Project operation. BIA brushes aside this inconvenient truth, asserting that "restoration of habitat is often an approach used to reduce the effects on species." FEIS at RTC-177. But "reduc[ing] the effects on species" is a far cry from assuring the Project would "not result in adverse effects" on this endangered butterfly during its decades of operation, as claimed.

72. The FEIS acknowledges that decommissioning activities will "result in temporary direct and indirect adverse effects on [the] Quino checkerspot butterfly," including collisions with equipment and vehicles, human disturbance, and noise impacts. FEIS at 87. Those adverse impacts are significant and cannot be ignored simply because the FEIS claims–without any supporting evidence– that the area will be restored to pre-Project conditions. Even with the best possible decommissioning plan, revegetation that *follows* the Project's operational impacts cannot bring dead Quino checkerspot butterflies back to life. FEIS at RTC-177; FEIS Appendix P at 3.

73. The significance of these errors and omissions is heightened by the importance of the Project area to the Quino checkerspot butterfly. As noted, the Project falls within the La Posta/Campo Core Occurrence Complex for the Quino checkerspot butterfly, on the eastern edge of the species' range. 74 Fed.Reg. 28776-28862 (June 17, 2009). FWS has concluded that preservation of these core occurrence complexes is

essential for recovery and survival of the Quino checkerspot butterfly. *Id*. This is because "[t]he eastern edge of Quino checkerspot's range supports large and robust butterfly populations, abundant and diverse larval host plants and nectar sources, and relatively low levels of development and intensive agriculture. These areas may provide climate refugia that Quino checkerspot will require under future predicted scenarios of climate change."[4] Therefore, the Project area is important not only because it is a core occurrence area, but also because it provides unique habitat essential to this species' survival in the face of the rapidly worsening perils of climate change. *Id*.

74.    Tacitly conceding the FEIS omits specific mitigation measures, BIA claims "NEPA does not require a fully developed plan that will mitigate all environmental harm before an agency can act." FEIS at RTC-177. But whether or not all environmental harm must be mitigated is a separate question from whether the FEIS' claim of "no adverse impacts" is supported by the supposed mitigation measures on which it bases this claim. As the FEIS acknowledges, "mitigation [must] be discussed in sufficient detail to ensure that environmental consequences have been fully evaluated." FEIS at RTC-177.

75.    That informational goal cannot be met where, as here, the FEIS' claims of "no adverse impacts" are not supported by the agency's record. Contrary to the FEIS' claims, MM-BIO-1 is not a mitigation measure. Instead, it merely announces an intent to develop as yet unidentified measures by listing catch phrases. FEIS Appendix P at 1-3.

76.    MM-BIO-3 is no less vague and unenforceable. It defers development of mitigation for the Project's impact on the Quino checkerspot butterfly until after Section 7 consultation with FWS is complete. FEIS Appendix P at 4. The FEIS makes vague statements such as "[r]atios for habitat-based mitigation (if any) shall be determined during the Section 7 consultation process," and "mitigation shall focus on habitat

---

[4] Preston, Kristine L., et al, 2012, "Changing distribution patterns of an endangered butterfly: Linking local extinction patterns and variable habitat relationships," *Biological Conservation* 152:280–290, 289 (attached to July 8, 2019 Comments as Exhibit 4).

preservation and creation for long-term conservation of metapopulation dynamics." FEIS Appendix P at 4. But the FEIS does not provide any specific information on what those measures may be, to what aspects of Project construction or operation they would apply, or when and how they would be implemented. Indeed, the FEIS admits there may not be *any* habitat-based mitigation at all. *Id.*

77. Without any actual delineation of the substance and timing of this supposed mitigation, the FEIS cannot rationally conclude that these unknown and thus entirely hypothetical mitigation measures will reduce the Project's impacts. And the FEIS' failure to acknowledge this lack of information is just another example in a long line of insufficient analyses. NEPA requires more.

78. The FEIS' analysis of the Project's impacts to the Quino checkerspot butterfly fails to reasonably inform decisionmakers and the public of those effects. Its discussion of the Project's impacts on this species accordingly violates NEPA.

**B. Noise Impacts**

79. The FEIS masks and downplays the Project's severe noise impacts, including audible noise, low-frequency sound and infrasound, even as the FEIS acknowledges that these impacts will be significant and unavoidable. The FEIS uses erroneous baseline data, omits essential reviews, employs flawed assumptions, misstates and misapplies key methodologies, and ignores opposing scientific opinion.

80. First, the FEIS studies the wrong turbines. The modeled turbines that Dudek (the company that wrote the FEIS) used to predict the Project's noise levels produce substantially–up to 52.38 percent–*less* power than the Project's turbines. Because larger turbines produce louder noise, the FEIS' use of smaller turbines to predict the Project's noise substantially understates the noise generated by the Project's wind generators. BIA knew that the Project's 4.2 MW turbines will produce more noise than the smaller turbines reviewed in the irrelevant study it used, yet BIA still used that study, knowingly understating the Project's noise impacts. FEIS at RTC-179. BIA's use of this bogus study to downplay the Project's noise violates NEPA.

81.     Second, Dudek ignored the Federal Transit Administration's Guidelines for Transit Noise and Vibration Impact Assessment ("FTA Guidelines") that measure the Project's *operational* noise, and instead used criteria that measure *construction* noise. Consequently, the actual severity of the Project's impacts on ambient noise is understated and in some areas, ignored altogether, such as during night operation, when impacted residents are prevented from sleeping.

82.     Third, the FEIS makes no effort to compare background ambient noise levels with the projected noise from the Project's operation. This is a severe shortcoming, because, as modern acoustic science recognizes and the FTA Guidelines codify, humans are sensitive to increases in noise levels over ambient levels, particularly at night. It is well established that the impacts of a given noise level are worse at night than they are during the day. Nighttime noise is particularly noticeable to humans for two reasons. First, ambient noise at night is usually much quieter than ambient noise during the day. Second, many studies have shown that obtaining a good night's sleep is important for both physical and mental health. Consequently, the impacts of the Project's elevated noise at night are especially significant.

83.     Fourth, the FEIS used manipulated baseline information. Its purported before-and-after noise measurements were taken at locations much farther from the Project than the noise-sensitive land uses the Project would impact. It ignored homes markedly closer to the Project and thus more impacted by its turbine noise than those the FEIS counted. Consequently, the FEIS under-reports Project noise levels and understates its impacts.

84.     Fifth, the FEIS inflated background noise to downplay the Project's dramatic increase in noise levels. It used noise level meters whose "noise floor" is greater than the far lower actual nighttime ambient noise in the Project area, thereby overstating the background noise levels. By exaggerating baseline noise readings, the FEIS understates the increase in ambient noise levels that the Project would cause.

85.     Sixth, the FEIS fails to analyze the Project's pure tone noise impacts such as

a whine, screech or hum, despite the fact that the San Diego Zoning Code directs that this evaluation be performed to determine the significance of noise impacts of a wind energy project.

86.    Seventh, despite the well-known fact that the Project area's high elevations are buffeted by strong winds, Dudek failed to use windscreens adequate to prevent wind turbulence from exaggerating the area's background noise.  Because it appears that windscreens (used to prevent wind-caused air turbulence that exaggerates noise levels measured by a microphone) were too small for the relatively high wind speeds in the Project area, the resulting measurements could have overstated the actual background noise levels, and thereby understated the Project's actual noise impacts.

87.    Eighth, the FEIS understates the long-range effects of the spinning turbines' ILFN on Noise Sensitive Land Uses.  Peer-reviewed research shows that humans are negatively affected by ILFN even where it is below the threshold of audibility, and "that individuals living near wind turbines are made ill, with a plethora of symptoms that commonly include chronic sleep disturbance," due to prolonged exposure.  FEIS Appendix T, Comment J-102 at 301.

88.    Ninth, the FEIS fails to correctly measure and assess the especially harmful effects of "amplitude modulation," a rhythmic fluctuation in noise level, like the bi-tonal fluctuation of the so-called European-style emergency vehicle siren, generated by wind turbine rotor noise.  Studies of amplitude modulation (fluctuation) indicate adverse sleep effects.  Wind turbine noise from similar projects in the area emits excessive amplitude modulation (peak-to-trough variation of 4 dBA or more) as defined in the scientific literature.  The FEIS ignores the effects of the Project's amplitude modulation on sensitive receptors by relying on inapplicable methodologies in a botched attempt to offset the FEIS' failure to predict these effects using the proper equipment and models.

89.    Finally, the FEIS relies on a modeling program that cannot accurately predict wind turbine noise.   The FEIS uses the computer program CadnaA to forecast noise generated by the Project's wind turbines despite the fact this program was not intended to

be applied to prediction of noise generated by large wind turbines due to the CadnaA program's inherent limitations. None of the criteria for using this program are met here, as both wind speeds and turbine heights greatly exceed those limits.

90.    Because the FEIS is plagued by serious methodological and measurement errors, and ignores the adverse health effects of ILFN, it substantially understates the Project's grave noise impacts on the community. "[A]lmost every time an EIS is ruled inadequate by a court it is because more data or research is needed." *Save Our Ecosystems v. Clark*, 747 F.2d 1240, 1249 (9th Cir. 1984). That same deficiency plagues the FEIS' noise impact analysis.

91.    "[T]he very purpose of NEPA's requirement that an EIS be prepared for all actions that may significantly affect the environment is to obviate the need for . . . speculation by insuring that the available data is gathered and analyzed prior to the implementation of the proposed action." *Wild Sheep*, 681 F.2d at 1179. Contrary to this fundamental NEPA mandate, the FEIS fails to accurately and reasonably inform the public and decisionmakers of the Project's noise impacts, including the impacts from audible noise, low-frequency sound and infrasound.

92.    For these reasons, the FEIS' noise impact analysis fails to reasonably inform decisionmakers and the public as NEPA requires, and must be declared inadequate.

## C.  Impacts to Water Resources

93.    The FEIS downplays the Project's impacts on groundwater in several key respects. First, it understates the community's existing and future groundwater demand, and the Project's adverse impact on groundwater levels should it be built.

94.    Second, it misapplies principles of hydrogeological analysis by overstating the groundwater available in the underlying Campo/Cottonwood Creek Aquifer, and understating the Project's likely drawdown of that basin. Understanding these effects is particularly crucial because this basin is designated as a sole source aquifer pursuant to section 1424(e) of the federal Safe Drinking Water Act, and the Environmental Protection Agency has determined that "contamination of [the] aquifer would create a significant

hazard to public health." 58 Fed.Reg. 31025 (May 28, 1993).

95.     Third, the FEIS ignores the impacts of past groundwater use by a recent energy project–the ECO Substation Project– thereby depriving the public of an understanding of how this Project may likewise lower groundwater.

96.     Fourth, the FEIS ignores the groundwater impacts if, as is likely, the Project uses on-site wells located in the southern portion of the Reservation.

97.     Fifth, the FEIS claims the Project would not harm groundwater quality during construction and decommissioning, based on a *hypothetical* stormwater pollution prevention plan ("SWPPP"). FEIS at 71. But it never specifies the SWPPP's best management practices because those practices, like the SWPPP itself, have not been formulated. FEIS at RTC-180. Instead, it merely provides a list of the stormwater control measures that "*could*" be included, without any analysis of the relative efficacy of the listed measures. FEIS at 15 (emphasis added). Indeed, the FEIS acknowledges that many of the sample BMPs "may not be appropriate" here. FEIS at RTC-180. Consequently, it violates NEPA's mandate that EISs must describe mitigation measures with sufficient detail to assess how well they "will serve to mitigate the potential harm" they target. *Wild Sheep*, 681 F.2d at 1181 (quote); *South Fork*, 588 F.3d at 727. Therefore, BIA cannot possibly "supply a convincing statement of reasons why [the] project's impacts are insignificant." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212.

98.     Sixth, the FEIS fails to adequately address the Project's hazardous wastes. The FEIS claims "hazardous materials would not be allowed to enter the septic system," and that creation of a Hazardous Materials Management Plan ("HMMP") would reduce all impacts of use, storage, and disposal of hazardous materials to less than adverse. FEIS at 28, RTC 180-181. But not all the Project's hazardous materials are discharged to the septic system. The Project also involves the storage and transport of hundreds of gallons of waste oil from *each* turbine on a regular maintenance schedule, an impact ignored by the FEIS. Further, preparation of the HMMP is impermissibly deferred. Without information about how these materials will be used, stored and disposed of, the public

1  and decisionmakers cannot ensure protection of the area's vulnerable water resources.

2  This is a critical omission because contamination of the underlying aquifer "would create

3  a significant hazard to public health." 58 Fed.Reg. 31025.

4      99.    Consequently, the FEIS' analysis of the Project's impacts to water resources

5  fails to reasonably inform decisionmakers and the public as NEPA requires.

6                              **D. Global Warming Impacts**

7      100.   The FEIS paints a rosy picture of the Project's global warming impacts, but

8  it is based on an incomplete analysis.  FEIS Appendix G at 29-44.  The FEIS admits that

9  it fails to calculate the Project's entire life cycle greenhouse gas ("GHG") emissions.

10 FEIS at RTC-46 (modeling tools used "did not account for the full life-cycle of GHG

11 emissions from construction activities").  Instead, the FEIS focuses on the GHG

12 emissions from on-site Project construction and operation.  FEIS at 4.5-1 to 3.  BIA

13 claims that this failure should be overlooked because it did consider some "directly

14 related GHG impacts."  FEIS at RTC-47.  But consideration of those impacts does not

15 make up for its failure to consider others.  Myriad published life cycle analyses

16 demonstrate that wind energy projects have many more sources of GHG emissions than

17 just on-site construction and operation.  As one recent study states, "due to GHG

18 emissions produced during equipment manufacture, transportation, on-site construction,

19 maintenance, and decommissioning, wind and solar technologies are not GHG emission

20 free."[5]  July 8, 2019 DEIS Comments Exhibit 11 at SI36.  That same study concluded,

21 based on a "systematic review and harmonization of life cycle assessment (LCA)

22 literature of utility-scale wind power systems," that industrial-scale wind turbines produce

23 11 g $CO_2$-eq/kWh (median value, with a range of 3 g $CO_2$-eq/kWh to 45 g $CO_2$-

24 eq/kWh).  July 8, 2019 DEIS Comments Exhibit 11 at SI36, SI46.  To adequately analyze

25

26 _____

27 [5] Dolan, Stacey L. & Garvin A. Heath, 2012, "Life Cycle Greenhouse Gas
   Emissions of Utility-Scale Wind Power: Systematic Review and Harmonization,"

28 *Journal of Industrial Ecology*, 16(SI) (attached to July 8, 2019 Comments as
   Exhibit 11).

the Project's global warming impact as NEPA requires, BIA must conduct a life cycle assessment of all of the Project's GHG emissions.

101. BIA claims a life-cycle analysis would be speculative "because a turbine model has not been selected for the Project and the location of manufacturing for turbine components is unknown." FEIS at RTC-47. But uncertainty about a specific turbine model is irrelevant. NEPA requires a hard look at the Project's *potential* impacts. Therefore, the FEIS must analyze the impacts of the Project's potential turbines, while acknowledging any gaps in the available information. The FEIS' speculative claim that these impacts might have been considered in other NEPA analyses likewise fails because these impacts are pertinent to and must be evaluated for this Project. Even if the impacts were analyzed in a prior NEPA document, BIA must still disclose that analysis in this FEIS. Moreover, because production of wind turbines is often project-dependent, the components for the Project may not be built at all if the Project is rejected, rendering their manufacturing impacts unreviewed unless they are examined now, in this FEIS.

**E. Shadow Flicker Impacts**

102. The Project's spinning wind turbines will produce invasive and disruptive "shadow flicker" every morning and evening. The FEIS fails to fully disclose and analyze, let alone mitigate, the impacts of shadow flicker. The FEIS admits that "receptors both On- and Off-Reservations may experience nuisance-level shadow flicker effects for more than 30 hours in a given year," and on-reservation receptors may also "experience shadow flicker for more than 30 minutes in a given day." FEIS at RTC-39 (first quote), 63 (second quote). These effects exceed the guidance and recommendations adopted for shadow flicker in multiple jurisdictions and for this FEIS. FEIS at 137.

103. Despite admitting that shadow flicker will exceed established thresholds, the FEIS downplays this impact by claiming that "the modern wind turbines that will be utilized for the Project will rotate well below any frequency of health concern." FEIS at RTC-38. But just as prolonged loud noise causes stress (and related harms) to those who are exposed to it even though they may not suffer hearing loss as a result, so too

prolonged shadow flicker will cause stress (and related harms) to those exposed to it whether or not they will also suffer injury to their eyesight. The FEIS ignores this adverse impact.

104. Further, as for injuries to the exposed public's health, the FEIS fails to provide any facts to support its claim that they will not suffer physical harm. It does not quantify or assess the potential frequency at which the turbines will rotate, nor reveal the frequency at which it would consider the turbines to pose a health concern. FEIS Appendix S. It provides no information about blade passage frequency or revolutions per minute. *Id*. Instead, it downplays the impact by discussing only the number of minutes per day, or hours per year, that a given receptor will be subjected to shadow flicker. But the severity of shadow flicker impacts depends on more than just duration; it also depends on the flicker's timing and frequency. The FEIS' omission of this vital information precludes informed evaluation of the Project's health and safety impacts on nearby residents.

105. The FEIS asserts that Project Design Features would be implemented to minimize the impacts of shadow flicker, including "coordinat[ion] with the relevant tribe to assess shadow flicker complaints made within one year from the initial operations date of the Project by the resident of any existing . . . Off-Reservations receptor located within a distance of 15 x Rotor Diameter (i.e. approximately 6,750 feet) of a Project turbine to assess their shadow flicker complaints made within one year from the initial operations date of the Project." FEIS at RTC-40 (defining "existing" as "existing as of the date of Record of Decision approval"). But this after-the-fact assessment fails to address, let alone prevent or otherwise mitigate, the impact before it happens. Merely documenting harm after it has occurred does nothing to prevent the harm in the first place. Moreover, the effects of shadow flicker extend for miles, much farther than 15 times the rotor diameter.

106. Furthermore, the FEIS removes what may have been a more effective mitigation measure. The DEIS stated that "'all turbine software would include

programming to reduce or shut off turbines during times of shadow flicker potential.'"
FEIS at RTC-39. But the FEIS removes that technology because "it was determined that
this design feature would significantly impact the economic benefits of the Project to the
Tribe." FEIS at RTC-39. Yet unsupported claims about possible costs do not justify
preemptive dismissal of a potentially effective mitigation measure.

107. NEPA requires a full discussion of the potential impacts of the Project, and
possibilities for mitigation. The FEIS must include this possible mitigation so that the
public and decisionmakers can at least weigh the benefits of its inclusion against the
claimed economic costs of its rejection.

### F. Visual Impacts

108. The Project includes sixty 586-foot tall wind turbines that will occupy
prominent positions on mountainous and high desert terrain including ridgelines that will
be visible to the public for miles. These enormous, unsightly structures will mar the
natural beauty of this wild and remote rural landscape. According to the Project
Description in the FEIS, the turbine hub height will extend up to 374 ft (114 m) and the
rotor diameter will be up to 460 feet, with approximately 230-foot long blades. FEIS
Appendix B at B-2. Adding the maximum hub height to the blade radius yields a
maximum height of 604 ft, not 586 ft as the FEIS claims. FEIS at 7. That 18-foot
difference equates to almost two stories of additional height. And whether the turbines
are 586 feet or 604 feet, they are exponentially larger than any other manmade structure
in the area.

109. Seven of these wind turbines will loom over the Tisdales' adjacent ranch,
substantially degrading their enjoyment of their bucolic rural property. Indeed, the
turbines are twice the 301-foot height of the Statue of Liberty, and even larger than the
enormous One American Plaza building in San Diego. The turbines would completely
dwarf all surrounding natural landmarks, and dominate and destroy the view from
surrounding viewpoints, including the Tisdales' ranch, irretrievably degrading the
existing natural beauty of this rural area. Vision Scape Imagery has prepared simulations

showing the impact of these gigantic turbines from both the Tisdales' property and other viewpoints, which are attached as Exhibit 3 to their March 11, 2020 FEIS comments.

110.   Additionally, numerous large industrial facilities will be sited along the border of the Tisdales' ranch, substantially degrading their beautiful view of the surrounding land.  Two photos that depict the view of the Reservation from the Tisdales' ranch are attached as Exhibit 1 to Ms. Tisdale's March 11, 2020 FEIS comments.  While the FEIS admits that the Project's visual impacts will be significant and unavoidable, it still understates those impacts.  FEIS at 120-125.

111.   The FEIS claims that mitigation measures will help reduce the visual impacts, but nothing can change the fact that the Project will dominate the view from the surrounding viewpoints, including the Tisdales' property where they have built their lives, and where they plan to enjoy their retirement years with their children, grandchildren, and great-grandchildren.  The FEIS' failure to accurately assess the visual impacts of the Project violates NEPA's informational purposes.

## G.  Wildfire Impacts

112.   Wildfire risk in the Project area is dangerously high due to heavy vegetation, aridity, high summer and fall temperatures, and frequent high winds, prompting its classification by CalFire as a "'High' to 'Very High' Fire Hazard Severity Zone."  This risk is exacerbated by the Project and is a danger that also threatens the Project's operation.  The FEIS acknowledges that the Project "would increase the potential for a wildfire and could impact the public and the environment by exposure to wildfire due to construction and decommissioning activities and ground disturbance with heavy construction equipment."  FEIS at 131, 132.  But the FEIS' meager, three-paragraph discussion fails to detail the increased risks of fire–and the increased risk to firefighting– posed by the Project's *operation* as NEPA requires.

113.   First, the FEIS fails to address the risk of wind-turbine fires that could occur during Project operation, despite several comments mentioning this serious risk.  The FEIS acknowledges that the Project "would increase the potential for a wildfire and could

impact the public and the environment by exposure to wildfire *due to construction and decommissioning activities* and ground disturbance with heavy construction equipment." FEIS at 131 (emphasis added). But the FEIS fails to disclose and discuss the far greater risks of ignition–and increased risks to firefighting–posed by the Project's *operation*. *Id.* It is well established that wind turbine motors can overheat due to mechanical wear or failure, ignite from the excessive heat, and then disperse flaming debris onto surrounding vegetation. The FEIS never addresses this known hazard. Instead of disclosing and discussing the substantial risk of ignition from operation, the FEIS speculates that a non-existent Campo Fire Protection Plan might be developed in the future to mitigate any fire risks. *E.g.* FEIS at RTC-230. But the FEIS' failure to analyze the Project's operational fire risks, and its reliance on an undeveloped mitigation plan, leave the public and decisionmakers in the dark. NEPA requires factual disclosure, not vague promises.

114. Second, the FEIS fails to address the fact that the Project's wind turbines and meteorological towers would directly interfere with both ground and aerial firefighting safety and effectiveness, due to several factors. These factors include the electrification of the 600-foot towers and power lines, which poses the risk of electrocution to firefighters; the towers' and lines' blockage of aerial application of retardant over nearby areas, particularly in smoky conditions; the fact that smoke can act as a conductor due to its high carbon content and transmit electricity from the towers and lines to the ground; and firefighters' inability to use solid-stream water applications around energized towers and lines due to the capacity of water to transmit electricity.

115. The impairment of aerial firefighting bears particular emphasis. Helicopters perform firefighting operations between 200 and 500 feet above ground level, to assure that their water drops are accurate and not dissipated by height, wind and evaporation. Similarly, air tankers and their lead planes usually fly at altitudes of 150 to 1,000 feet above ground surface during firefighting operations to maximize accuracy and effective concentration of the retardant. But none of these operations can be performed safely and effectively where turbines and meteorological towers block those operations by jutting up

to 600 feet into the airspace, as this Project allows. This hazard is exacerbated when smoky conditions impair visibility during firefighting.

116. The FEIS ignores these impacts on fire ignition and suppression, and therefore fails to take the required hard look at the Project's wildfire impacts.

## H. Impacts on Aviation

117. The FEIS fails to adequately address the Project's impacts on military, commercial and private aviation in the area. These impacts concern both aviation safety and the wildfire hazard posed by aerial collisions with the Project's turbines. This hazard is so great, it caused the Federal Aviation Administration ("FAA") to declare some of the Project's towers to be hazards to aviation–a fact the FEIS never reveals.

118. The FEIS claims that the Project "would comply with any applicable FAA requirements to ensure that FAA, military, and emergency responders navigate the area safely" (FEIS at RTC-206), but never discloses, let alone analyzes, those requirements and the Project's violations of them. *Id*. It ignores the Project's impacts to the military's heavy use of the area and to the air traffic control and radar operated by the Departments of Defense and Homeland Security, as documented by the FAA. *See, e.g.,* Https://oeaaa.faa.gov/oeaaa/external/gisTools/gisAction.jsp (Coordinates 32 41 28.72 N and 116 19 19.52 W).

119. The FAA's review found the Project posed impacts "highly likely to Air Defense and Homeland Security radars," and therefore concluded that an "*Aeronautical study [was] required*." (Emphasis added.) This "required" aeronautical study should have been disclosed and discussed in the FEIS. The FEIS' vague and baseless claims of future compliance with "any applicable" FAA requirements cannot substitute for actual analysis of those very serious impacts. Plaintiffs alerted BIA of their concerns regarding the FAA's findings, but to no avail. BIA never took the hard look that NEPA requires.

## I. Socioeconomic Impacts

120. The Project would harm use and enjoyment of their homes and ranches by residents of the surrounding rural community of Boulevard. Many of those residents are

retired and elderly, on fixed or limited incomes, and have lived in the area for decades. For example, Mr. Tisdale has lived and ranched at Morning Star Ranch for 55 years, and Ms. Tisdale, a fourth generation California rancher and co-owner of Morning Star Ranch, has been there with him for 43 years. The Tisdales' home, ranch, and rental property represent the hard-earned savings of their lifetimes, and would, if the Project is built, suffer a substantial diminution in value–along with many other properties in the surrounding area–should the Project proceed.

121. The FEIS concludes that "the presence of wind turbines" is not a factor in changes in property values, and that the Project's impacts "would be insignificant." FEIS at RTC-44. These claims are false. Many residents of other rural communities have left their homes–often suffering severe economic losses–after wind turbines began operating nearby. The incessant noise, vibration and flashing night lights have interfered with sleep and destroyed enjoyment of their homes. So too here, the Project will cause significant impacts on the Tisdales and their neighbors in the community. The Project will replace the currently pristine view outside the Tisdales' home and seen through their windows with a gigantic, ugly, industrial nightmare of towering and whining wind turbines. Those turbines will dramatically increase audible and inaudible sound pressures, and create shadow flicker for hundreds of hours per year, causing physical discomfort and annoyance for the Tisdales and others present on their property. It will replace their stunning dark night sky with its brilliant blaze of stars with annoying, incessantly blinking red lights and noisy, whirling 230-foot long turbine blades.

122. While admitting that "environmental and physical changes may affect property values within an immediate distance of a wind project" the FEIS declines to attribute any significance to this effect, and instead dismisses these impacts as having only a speculative impact on property value. FEIS at RTC-45. This conclusion completely ignores the overwhelming evidence of property value destruction before the agency and fails to heed NEPA's informational purpose.

//

**E.    The FEIS Improperly Defers Analysis of Mitigation Measures**

123.    NEPA mandates that mitigation measures "'be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated.'" *City of Carmel-by-the-Sea*, 123 F.3d at 1154 (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 353 (1989)); *Laguna Greenbelt, Inc. v. U.S. Department of Transportation*, 42 F.3d 517, 528 (9th Cir. 1994)). "'[A] mere listing of mitigation measures is insufficient to qualify as the reasoned discussion required by NEPA.'" *Neighbors of Cuddy Mountain v. U.S. Forest Service*, 137 F.3d 1372, 1380 (9th Cir. 1998).  An FEIS may not defer assessment of their effectiveness.  Otherwise, it cannot serve its purpose of "evaluating whether anticipated environmental impacts can be avoided." *South Fork*, 588 F.3d at 727 (recognizing that "'[f]easibility and success of mitigation would depend on site-specific conditions and details of the mitigation plan'").

124.    Here, the FEIS improperly defers formulation of several important mitigation plans until the Project is under construction, improperly deferring analysis of their effectiveness.  The FEIS' deferred plans include, for example, mitigations for QCB (FEIS Appendix P at P-4), storm-water (FEIS at 15, RTC-180), fire risks (FEIS at 131) and a HMMP (FEIS at 128, RTC-181).  Each of these deferrals omits all, let alone "sufficient," "detail to ensure that environmental consequences have been fairly evaluated." *South Fork*, 588 F.3d at 727; *Carmel*, 123 F.3d at 1154.  Contrary to NEPA, these supposed mitigations present no detail whatsoever, and instead merely call for future development and implementation of broad concepts, such as reducing avian species impacts or noise.  Without site-specific performance standards, it is impossible to analyze their effectiveness. *South Fork*, 588 F.3d at 727; *Carmel*, 123 F.3d at 1154.

125.    The FEIS references these plans as a means of mitigating adverse consequences of the Project, but fails to provide *any specific information* as to what these future plans might contain.  This is not a situation where otherwise complete mitigation measures leave room for minor *adjustments* as the project progresses.  Rather, many of these measures are left entirely undeveloped.  The FEIS' failure to "ensure that

environmental consequences have been fairly evaluated" violates NEPA. *Carmel*, 123

F.3d at 1154; *South Fork*, 588 F.3d at 727.

## V. Conclusion

126. For each of the foregoing reasons, the FEIS is deficient and the Project approval must be set aside. By approving the Campo Wind Project based on an inadequate EIS, BIA violated NEPA, 42 U.S.C. section 4321 *et seq.,* and its implementing regulations, 40 C.F.R. section 1500 *et seq.* And by approving the Project without complying with NEPA, BIA failed to proceed in accordance with law in violation of the APA, 5 U.S.C. sections 706(2)(A) and (D).

## SECOND CLAIM FOR RELIEF

(Violation of the Migratory Bird Treaty Act)

(Against All Defendants)

127. The paragraphs set forth above and below are realleged and incorporated herein by reference.

128. The Migratory Bird Treaty Act ("MBTA"), 16 U.S.C. section 701 *et seq*., directs that unless otherwise permitted, "it shall be unlawful at any time, by any means or in any manner, to . . . take [or] kill . . . any migratory bird . . . nest, or egg of any such bird . . . included in the terms of the conventions between the United States and Great Britain . . .the United Mexican States . . . the government of Japan . . . and the Union of Soviet Socialist Republics for the conservation of migratory birds and their environments . . . ." 16 U.S.C. §703.

129. The MBTA applies with equal force to federal agencies as it does to private individuals. *Humane Society of the U.S. v. Glickman*, 217 F.3d 882, 884-88 (D.C. Cir. 2000); *American Bird Conservancy, Inc. v. F.C.C.*, 516 F.3d 1027, 1032 (D.C. Cir. 2008). And, it may be enforced against the federal government by private citizens through the APA. *Id.* "[A]nyone who is 'adversely affected' by an agency action alleged to have violated the MBTA has standing to seek judicial review of that action." *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1203-04 (9th Cir. 2004).

Complaint for Declaratory and Injunctive Relief                     - 40 -                     Case No. TO BE ASSIGNED

130.    Federal agencies like BIA must ensure that their actions do not result in violations of the MBTA.  *City of Sausalito*, 386 F.3d at 1225;  *Mahler v. U.S. Forest Service*, 927 F. Supp. 1559, 1573 (S.D.Ind. 1996); *Humane Society,* 217 F.3d at 885; *Robertson v. Seattle Audubon Soc.*, 503 U.S. 429, 438-39 (1992); Exec. Order No. 13186, Responsibilities of Federal Agencies to Protect Migratory Birds, 66 Fed.Reg. 3853 (Jan. 17, 2001).  Here, however, BIA failed to comply with the MBTA because it approved the Project without requiring a takings permit under the MBTA.

131.    An MBTA permit is required for the Project because it will take migratory birds.  The FEIS admits that some "171 avian species were detected in the [Project's] biological study area," including many raptors such as golden eagle, Cooper's hawk, red-tailed hawk, northern harrier and American kestrel, and other sensitive species such as California condor, long-eared owl, and burrowing owl.  FEIS at 39 and Appendix H at 99-103.  Raptors, crows and species allied with them are among those at greatest risk of being killed, because they are the birds most frequently observed in the rotor-sweep zone, where the spinning blades collide with and kill birds.  FEIS at RTC-28.  Other migratory bird species inhabiting or using the Project site included the California horned lark, the loggerhead shrike, the gray vireo, the least Bell's vireo, the southwestern willow flycatcher, the olive-sided flycatcher, the yellow warbler, the Bell's sage sparrow, the southern California rufous-crowned sparrow, the Vaux's swift and the tricolored blackbird.  FEIS Appendix H at 96-100.

132.    As the FEIS recognizes–albeit in language that attempts to blame the victim–many "special-status bird species have the potential to collide with towers and transmission lines and have the potential to be electrocuted by the transmission towers associated with the Tule Wind Project, resulting in injury or mortality."  FEIS at 88 ("Direct effects on avian species . . . may include collisions with wind turbines and Met towers, and electrocution from overhead transmission lines"); FEIS Appendix H at 119 (direct impacts of the project will "include continuing operational impacts such as avian and bat collisions with wind turbines"), 136 (the Project will potentially cause golden

1  eagle collision with turbines), 137 ("Red-tailed hawks, turkey vultures, and common
2  ravens . . . have the greatest risk of collision with Project turbines. . . [but] many species
3  were observed on site and collision is possible with any of the species"), 139 ("impacts to
4  bats could result in mortality or injury due to collisions at wind turbines).   Raptors such
5  as golden eagles are particularly at risk because they necessarily look down rather than
6  ahead when they are hunting their ground-dwelling prey (such as squirrels), and thus can
7  unknowingly fly directly into the path of the rotor blades, which reach speeds of up to
8  200 mph at their tips.

9      133.   Furthermore, in addition to the direct killing of these birds, the FEIS admits
10 that wind turbines create "a behavioral avoidance area, thereby establishing a barrier in
11 the aerial habitat used by birds and bats."  FEIS at 88; FEIS Appendix H at 126.  This
12 displacement of birds from their nesting and foraging habitat – thereby directly harming
13 or killing the displaced birds – also constitutes a take under the MBTA.  16 U.S.C. §703.

14     134.   Despite the fact that the Project is likely to kill migratory birds during both
15 the construction and operation phases, BIA has not applied for or secured any permits
16 under the MBTA.  FEIS at 88 ("Direct effects on avian species protected under the
17 Migratory Bird Treaty Act resulting from construction and operations of Alternative 1
18 [the approved Project] may include collisions with wind turbines and Met towers, and
19 electrocution from overhead transmission lines"), 90-91 ("both build alternatives'
20 construction and operations would result in adverse biological resource effects related to
21 . . . migratory birds protected by the Migratory Bird Treaty Act").  And while BIA has
22 listed compliance with the MBTA as a potentially required permit, nowhere in its FEIS or
23 ROD is there any requirement that the Project applicant obtain any MBTA permit.  FEIS
24 at 2.

25     135.   By failing to first obtain, or require that the Project applicant or operators
26 obtain, an MBTA permit before approving the Project and allowing the unpermitted
27 taking of migratory birds, BIA violated the MBTA (16 U.S.C. section 703) and the
28 APA's prohibition on unlawful agency action (5 U.S.C. section 706(2)(A) and (D)).

**THIRD CLAIM FOR RELIEF**

(Violation of the Bald Eagle and Golden Eagle Protection Act)

(Against All Defendants)

136.    The paragraphs set forth above and below are realleged and incorporated herein by reference.

137.    The Bald and Golden Eagle Protection Act ("Eagle Act"), 16 U.S.C. section 668, contains criminal and civil prohibitions against the taking of golden eagles. Subdivision (b) makes it a civil offense to "take . . . in any manner. . . any golden eagle." 16 U.S.C. §668(b).  Under the Eagle Act, "'take' includes also pursue, shoot, shoot at, poison, wound, kill, capture, trap, collect, molest or disturb."  16 U.S.C. §668c; 50 C.F.R. §22.3 ("Take includes also pursue, shoot, shoot at, poison, wound, kill, capture, collect, or molest or disturb").  Regulations adopted pursuant to the Eagle Act direct that no person may "take . . . any golden eagle . . . except as allowed by a valid permit issued under this part [22 of 50 C.F.R.]."  50 C.F.R. §22.11.

138.    As discussed above, the FEIS recognizes that Project operation would almost assuredly kill birds, including golden eagles.  It is thus a near certainty that the Project will "take" golden eagles and thereby violate the Eagle Act.  And while BIA has stated that it will require preparation of a BBCS, (ROD 37-38), it also admits that even with the BBCS, avoidance of protected species may not be feasible.  FEIS Appendix H at 142.

139.    By approving the Project and its almost certain killing and/or other "taking" of golden eagles without requiring that a takings permit be obtained pursuant to the Eagle Act's regulations, BIA violated the Eagle Act and failed to proceed in accordance with law as required by APA sections 706(2)(A) and (D).

**PRAYER FOR RELIEF**

140.    As relief for the above violations of law, plaintiffs respectfully request the following:

1.      Adjudge and declare that the BIA's Project approvals – including its April 7, 2020 ROD authorizing the Project and the Land Lease, and its March, 2020

FEIS, violate NEPA, the MBTA, the Eagle Act and the APA;

2. Order BIA to withdraw its Project approvals and its March 2020 FEIS until such time as it has complied with NEPA, the MBTA, the Eagle Act, the APA and their implementing regulations;

3. Preliminarily and permanently enjoin BIA from initiating or permitting any activities in furtherance of the Project that could result in any change or alteration of the physical environment unless and until the Defendants comply with the requirements of NEPA, the MBTA, the Eagle Act, and their implementing regulations;

4. Award Plaintiffs their reasonable attorneys' fees and costs and expenses incurred in connection with the litigation of this action pursuant to the Equal Access to Justice Act, 28 U.S.C. section 2412, or as otherwise provided by law; and

5. Any other relief that this Court deems just and proper.

Dated: July 8, 2020                    Respectfully submitted,

                                        /s/ *Stephan C. Volker*
                                        STEPHAN C. VOLKER
                                        Attorney for Plaintiffs BACKCOUNTRY
                                        AGAINST DUMPS, DONNA TISDALE,
                                        and JOE E. TISDALE