Rebecca L. Reed (Bar No. 275833)
E-mail:     rebecca.reed@procopio.com
Justin M. Fontaine (Bar No. 323357)
E-mail:     justin.fontaine@procopio.com
PROCOPIO, CORY, HARGREAVES
     & SAVITCH LLP
525 B Street, Suite 2200
San Diego, CA 92101
Telephone: 619.238.1900
Facsimile: 619.235.0398

Attorneys for Intervenor-Defendant
CAMPO BAND OF DIEGUENO MISSION
INDIANS

# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

BACKCOUNTRY AGAINST DUMPS;
DONNA TISDALE; and JOE E.
TISDALE,

        Plaintiffs,

v.

UNITED STATES BUREAU OF
INDIAN AFFAIRS; DARRYL
LACOUNTE, in his official capacity as
Director of the United States Bureau of
Indian Affairs; AMY DUTSCHKE, in
her official capacity as Regional Director
of the Pacific Region of the United States
Bureau of Indian Affairs; UNITED
STATES DEPARTMENT OF THE
INTERIOR; DAVID BERNHARDT, in
his official capacity as Secretary of the
Interior; and TARA SWEENEY, in her
official capacity as Assistant Secretary of
the Interior for Indian Affairs,

        Defendants.

Case No. 3:20-cv-02343-JLS-DEB

**MEMORANDUM OF POINTS
AND AUTHORITIES IN
SUPPORT OF CAMPO BAND OF
DIEGUENO MISSION INDIANS'
MOTION TO DISMISS**

Ctrm.:     4D
Judge:     Hon. Janis L. Sammartino

Complaint Filed:   July 8, 2020
Trial Date:     Not set

1

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CAMPO
BAND OF DIEGUENO MISSION INDIANS' MOTION TO DISMISS
CASE NO. 3:20-CV-02343-JLS-DEB

DOCS 113061-00000011/4293113.7

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION .................................................................................... 5

II. STATEMENT OF FACTS ......................................................................... 7

    A. THE CAMPO RESERVATION'S LIMITED NATURAL RESOURCES PROVIDE LIMITED ECONOMIC OPPORTUNITY ... 7

    B. THE TRIBE'S ARDUOUS EFFORTS TO DEVELOP ITS LAND AND IMPROVE ITS ECONOMIC CONDITION HAVE BEEN STYMIED BY ITS REMOTE LOCATION AND PLAINTIFF'S PERPETUAL SELF-INTERESTED INTERFERENCE ...................... 9

        1. Since the 1990s, Backcountry Against Dumps Interfered with Two Landfill Opportunities. ......................................................... 9

        2. The Tribe's Gaming Opportunities Have Been Limited Because of Its Remote Location. ................................................................ 10

        3. The Tribe Pursues the Kumeyaay Wind Project Which Plaintiffs Opposed. ....................................................................... 10

        4. Plaintiff Opposes the Tribe's Expansion of Its Kumeyaay Wind Project. ............................................................................. 11

        5. Plaintiff Opposes the Tribe's Sale of Water to a Utility Project. 12

    C. THE PROJECT IS THE REALIZATION OF THE TRIBE'S ENERGY VISION AND THE PRIMARY SOURCE OF FUNDS FOR THE TRIBE'S GOVERNMENT OPERATIONS ........................................ 12

III. ARGUMENT ....................................................................................... 16

    A. LEGAL STANDARDS. .................................................................... 16

    B. THE TRIBE IS A REQUIRED PARTY ............................................... 17

        1. The Tribe Has an Interest in the Action That Will Be Impaired Absent the Tribe's Involvement .................................................. 17

        2. Existing Parties Will Not Adequately Represent the Tribe's Interests ................................................................................... 19

    C. THE TRIBE CANNOT BE JOINED ................................................... 21

    D. THE ACTION CANNOT PROCEED IN EQUITY AND GOOD CONSCIENCE WITHOUT THE TRIBE ............................................ 22

        1. The Tribe Will Suffer Prejudice If the Litigation Continues ...... 23

        2. Relief Cannot Be Shaped in a Way to Avoid Prejudice to the Tribe ........................................................................................ 23

        3. The Court Should Dismiss This Action, Even If Plaintiffs Are Without an Alternative Remedy .................................................. 24

    E. THE PUBLIC RIGHTS EXCEPTION DOES NOT APPLY ............... 25

IV. CONCLUSION ..................................................................................... 27

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Cachil Dehe Band of Winturn Indians of the Colusa Indian Cmty. v. California*
  547 F.3d 962 (9th Cir. 2008) .................................................................. 17

*Camancho v. Major League Baseball*
  297 F.R.D. 457 (S.D. Cal. 2013) ........................................................... 17

*CP Nat'l Corp. v. Bonneville Power Admin.*
  928 F.2d 905 (9th Cir. 1991) ................................................................. 16

*Dawavendewa v. Salt River Project Agr. Imp. & Power Dist.*
  276 F.3d 1150 (9th Cir. 2002) ........................................................... 5, 21

*Diné Citizens Against Ruining Our Env't v. Bureau of Indian Affairs*
  932 F.3d 843 (9th Cir. 2019), *cert. denied*, 141 S. Ct. 161 (2020) ............ *passim*

*Jamul Action Committee v. Simermeyer*
  974 F.3d 984 (9th Cir. 2020) .......................................................... 21, 22

*Kescoli v. Babbitt*
  101 F.3d 1304 (9th Cir. 1996) ......................................................... *passim*

*Makah Indian Tribe v. Verity*
  910 F.2d 555 (9th Cir. 1990) ................................................................... 5

*McDonald v. Means*
  309 F.3d 530 (9th Cir. 2002) ................................................................. 20

*Paiute-Shoshone Indians of Bishop Community of Bishop Colony, Cal. v. City of Los Angeles*
  637 F.3d 993 (9th Cir. 2011) ................................................................. 17

*Republic of Philippines v. Pimentel*
  554 U.S. 851 (2008) ............................................................................... 22

*Santa Clara Pueblo v. Martinez*
  436 U.S. 49 (1978) ................................................................................. 22

*Shermoen v. United States*
    982 F.2d 1312 (9th Cir. 1992) ............................................................. 26

*United States v. Algoma Lumber Co.*
    305 U.S. 415 (1939) ............................................................................ 20

*White v. Univ. of Cal.*
    765 F.3d 1010 (9th Cir. 2014) ............................................................ 17

**Federal Statutes, Regulations and Rules**

25 C.F.R. pt. 162 ...................................................................................... 15

85 Fed. Reg. 5462-01, 5463 (Jan. 30, 2020) ............................................. 5

25 U.S.C.
    § 415 ................................................................................................... 15
    § 415(a) ................................................................................................. 6

42 U.S.C.
    §§ 4321-4347 ............................................................................... *passim*

Federal Rules of Civil Procedure
    Rule 12(b)(7) ...................................................................................... 16
    Rule 19 ............................................................................................... 16
    Rule 19(a) ........................................................................................... 16
    Rule 19(a)(1) ...................................................................................... 19
    Rule 19(a)(1)(B)(i) ............................................................................... 7
    Rule 19(a)(2)(i) ................................................................................... 17
    Rule 19(b) ............................................................................................ 7

DOCS 113061-00000011/4293113.7

Intervenor-Defendant CAMPO BAND OF DIEGUENO MISSION INDIANS (the "Tribe") respectfully submits the following Memorandum of Points and Authorities in support of its Motion to Dismiss.

## I.

## INTRODUCTION

The Campo Band of Diegueno Mission Indians, otherwise known as the Campo Kumeyaay Nation, is a federally recognized tribe comprised of Kumeyaay people consisting of approximately 310 enrolled citizens ("Tribal Members"). (Declaration of Marcus Cuero ("Cuero Decl."), ¶ 5; *see also* 85 Fed. Reg. 5462-01, 5463 (Jan. 30, 2020).) The Tribe is governed by the General Council of the Tribe pursuant to the Constitution of the Campo Band of Mission Indians, which was adopted by the Tribe's members on July 13, 1975, and approved by the Bureau of Indian Affairs on January 20, 1976 (the "Constitution"). (Cuero Decl. at ¶ 6.)

In this litigation, Plaintiffs Backcountry Against Dumps and Donna and Joe Tisdale ("Plaintiffs") seek to prevent construction and operation of a $400 million renewable energy project (the "Project") that the Tribe has negotiated and approved to be built and operated on the Campo Indian Reservation (the "Reservation") by Intervenor-Defendant Terra-Gen Development Company, LLC ("Terra-Gen"). Terra-Gen is an owner, operator and developer of utility-scale renewable and clean energy assets, operating twenty-six facilities throughout the Western United States which include wind, solar thermal and geothermal plants.  Upon completion, the Project will generate an estimated 252 megawatts of electrical power from renewable wind resources generated by sixty wind turbines and supported by associated infrastructure within a 2,200-acre corridor of the Reservation. (*See* Dkt. #42 at ¶¶ 2, 27.)  If Plaintiffs succeed in this litigation, however, the Project will be halted, threatening tens of millions of dollars in tribal revenue, jobs for Tribal Members, and the sovereign right to control tribal resources and property.

The Tribe's decisions related to the Project reflect the Tribe's strategic decision to pursue an Energy Vision for its land, consistent with the western renewable energy zone in which it lies as identified by the Western Governors' Association. In doing so, the Tribe has committed to utilizing the abundant natural wind resources on the Reservation for the benefit of current and future generations of the Campo people, supporting the Tribe in a sustainable and environmentally responsible manner.

The Tribe has also pursued the Project in furtherance of the Tribe's fiscal plan. After nearly thirty years of arduous attempts to make economic use of the Tribe's remote, non-arable land (many of which were frustrated and opposed by the same small group of neighbors organized as the Plaintiff in this action), the Project has and will generate significant revenue from the Tribe's limited resources. Importantly, the Project will serve as the principal means of funding the Tribe's government operations, which serves an underprivileged community with a high and disproportionate rate of poverty. In short, the Project is critical to the Tribe's economic and overall well-being since it will finally allow the Tribe to carry out desperately needed social and economic services for its members which it is responsible for as a self-governing Tribe.

Implementing these strategic decisions, the Tribe's General Council approved a 25-year lease (the "Lease") between the Tribe and Terra-Gen for the Project. Because the United States holds the Tribe's lands in trust for the Tribe, the parties obtained approval for the Lease from the Bureau of Indian Affairs ("BIA"), pursuant to 25 U.S.C. § 415(a), in 2020.  However, Plaintiffs seek to invalidate that Lease approval and the Project's Environmental Impact Statement ("EIS"). An order invalidating these approvals—and thereby preventing the construction and operation of the Project—would have devastating fiscal and economic consequences for Tribe. If Plaintiffs were successful, it would unequivocally cause the Tribe to lose substantial financial payments due under the Lease, and as a consequence, the loss of intended social and government benefits for its Tribal Members. The relief Plaintiffs seek would also result in the loss of jobs for Tribal Members and would frustrate the Tribe's

6

strategic management of its property and wind resources.

The Tribe's substantial interests in the Lease and Project – the very subject matter of this action – are directly and materially impacted by the outcome of this matter. Thus, the Tribe is a required party pursuant to Federal Rule of Civil Procedure 19(a)(1)(B)(i). However, as will be discussed, the Tribe has sovereign immunity and therefore, as a matter of law, cannot be summoned as a party to this action. Plaintiffs should not be allowed to extinguish the Tribe's rights in the Lease and Project in the Tribe's absence. As our Courts make clear in applying Rule 19(b) in this factual scenario, the Tribe is an indispensable party which compels the dismissal of this action. *See Diné Citizens Against Ruining Our Env't v. Bureau of Indian Affairs*, 932 F.3d 843, 851 (9th Cir. 2019), *cert. denied*, 141 S. Ct. 161 (2020) (citing Fed. R. Civ. P. 19(a)(1), 19(b)).

## II.

## STATEMENT OF FACTS

### A.   THE CAMPO RESERVATION'S LIMITED NATURAL RESOURCES PROVIDE LIMITED ECONOMIC OPPORTUNITY.

The Reservation was established in 1893 and currently comprises 16,512 acres of land located in eastern San Diego County, and is home to over 500 individuals, including Tribal Members and their families. (Cuero Decl., ¶ 7.) The Tribe's economic and job opportunities are scarce. This is true as a consequence of the Reservation's remote location, which is fifty miles from any job center, absence of reliable public transportation and limited natural resources of non-arable land, wind and sun. (*See id.* at ¶¶ 8, 45.) These conditions have made it difficult for the Tribe to foster any self-generated economic development and hinders outbound job opportunities for Tribal Members. (*Id.* at ¶ 19) Given the foregoing circumstances, the Reservation has a limited source of cash flow to support the community and tribal government operations.

7

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CAMPO
BAND OF DIEGUENO MISSION INDIANS' MOTION TO DISMISS
CASE NO. 3:20-cv-02343-JLS-DEB

DOCS 113061-00000011/4293113.7

The Tribe's geographic conditions, economic limitations and historical inequities and realties have negatively impacted the Kumeyaay people. (*Id.* at ¶ 20.) Very few Tribal Members pursue a higher education, which exacerbates the Tribe's economic difficulties. (*Id.*) Approximately 53% to 62% of the population living on the Reservation lives below the poverty level (which significantly exceeds the average percentage of people living below the poverty level in San Diego County, which was approximately 15% in 2010). (*Id.* at ¶ 18.) This condition has not changed in the ensuing ten years. (*Id.*).

As a consequence of these circumstances, the Reservation suffers inadequate income, which in turn limits the Campo tribal government from providing all of the governmental and culturally-relevant social services it is responsible to facilitate as a self-governing tribe. (*Id.* at ¶ 14.)

The services provided by the Tribe's government include, *inter alia*, fire and emergency services, access to utility services and communications, waste management, water well testing and maintenance, environmental protection, natural habitat restoration and maintenance, land use planning, road maintenance and development, social services, water and sewer needs, educational services, and cultural education, preservation and development programs. (*Id.*) In addition to the costs incurred in connection with providing these services, the Tribe has developed a General Welfare Ordinance designed to provide Tribal Members essential needs, including utilities, infrastructure, housing (e.g., rental assistance and home rehabilitation assistance), education (e.g., tuition costs, supplies, and transportation costs), transportation to essential services, elder and disable programs (e.g., meal assistance, home care, and transportation), child day-care, cultural immersion and involvement (e.g., expenses related to attending and participating in cultural and religious ceremonies) and end of life traditions. (*Id.*)

To date, the Tribe is currently unable to fund many of the programs and services authorized by the General Welfare Ordinance due to inadequate tribal government

8

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CAMPO
BAND OF DIEGUENO MISSION INDIANS' MOTION TO DISMISS
CASE NO. 3:20-CV-02343-JLS-DEB

DOCS 113061-00000011/4293113.7

income. (*Id.*)

Unlike state and local governments, the Tribe does not have the benefit of a broad property tax system to create a tax base to generate revenue; therefore, independent tribal economic development is critical for the Tribe to gain income to provide the much needed governmental and social services to the Tribe's members and residents. (*Id.* at ¶ 16.) While the Tribe has primarily attempted to obtain limited federal funding to provide government and social services, federal funding is inconsistent and the limitations on such funding can be overly burdensome. (*Id.* at ¶ 15.) As a result, many of the Tribe's services and needs remain unfulfilled. (*Id.*)

**B.   THE TRIBE'S ARDUOUS EFFORTS TO DEVELOP ITS LAND AND IMPROVE ITS ECONOMIC CONDITION HAVE BEEN STYMIED BY ITS REMOTE LOCATION AND PLAINTIFF'S PERPETUAL SELF-INTERESTED INTERFERENCE**

The Tribe has not passively submitted to the circumstances of its geography and social and economic difficulties. It has proactively sought out federal funding and availed itself of Tribal gaming opportunities, pursued a landfill project, wind projects and a water sale to local utility providers in an effort to shore up its funding to support its community. Most of these efforts were frustrated by opposition from the same Plaintiffs in this action, and some were unsuccessful as a consequence of the Tribe's inherent geographical difficulties. As such, the Tribe's above-described economic condition, including high disproportionate rate of poverty, remains.

### 1.   Since the 1990s, Backcountry Against Dumps Interfered with Two Landfill Opportunities.

In the 1990s, the Tribe was unified in its support of development of a landfill to use its non-arable land for economic development. (*Id.* at ¶ 48.) The Tribe developed its own environmental programs to regulate a new landfill project, only to be frustrated at every turn by the neighbors in opposition - "Backcountry Against Dumps." (*Id.*) Ten years later, the Tribe tried a second time to develop a similar landfill on the Reservation. (*Id.* at ¶ 49.) ***During the environmental review process, Plaintiff***

9

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CAMPO BAND OF DIEGUENO MISSION INDIANS' MOTION TO DISMISS CASE NO. 3:20-CV-02343-JLS-DEB

DOCS 113061-00000011/4293113.7

***Backcountry Against Dumps* repeatedly stated it would support any projects by the Tribe other than a landfill.** (*Id*.) The second landfill project ultimately failed due largely to a significant misinformation campaign and by frustrating the economic partner for the project. (*Id.*)

## 2. The Tribe's Gaming Opportunities Have Been Limited Because of Its Remote Location.

In the late 1990's, the Tribe also sought to take advantage of Tribal gaming opportunities, and in 2001 the Tribe opened the small Golden Acorn Casino. (*Id.* at ¶ 50.) The success of the casino, however, has been curtailed by the Tribe's isolated rural location, which has similarly impacted other rural casinos in the County causing them to close. (*Id.* at ¶ 21.) The COVID-19 pandemic has further diminished the Tribe's income from the Casino underscoring the Tribe's urgent need to diversify its economy. (*Id.*) As a result of the limited success of the Casino, the Tribe has been forced to operate less than 350 Class III gaming devices, which classifies the Tribe as a "Non-Compact Tribe" due to the limited revenue received. (*Id*.)

## 3. The Tribe Pursues the Kumeyaay Wind Project Which Plaintiffs Opposed.

Following the Tribe's unsuccessful landfill pursuits, the Tribe turned to its other resources in abundance—wind—as a source for economic development. (*Id.* at ¶ 51.) After the Reservation became part of a hub of the area's renewable energy resource zone identified by the Western Governors' Association, the Tribe developed an Energy Vision to utilize the natural wind resources on the Reservation to benefit the needs of the Tribal Members for current and future generations in a sustainable and environmentally responsible manner. (*Id*.) In 2006, in a lease agreement with a private company, the Tribe commissioned a small (50 MW) wind energy project called Kumeyaay Wind on the Reservation. (*Id.*)

Despite Plaintiff Backcountry Against Dumps' representation that it would support any Tribal project other than a landfill, Plaintiff opposed the wind project.

Notwithstanding Plaintiff's opposition efforts, the Tribe was able to complete its project. (*See id.* at ¶¶ 51-52.)

While the Kumeyaay Wind project demonstrated that the Reservation lands could facilitate viable wind generation, the project has not provided a financial boost to the Tribe. (*Id.* at ¶ 52.) Of the net revenue created by the project, only 20% is payable to the Tribe through land lease payments, with much of the remainder going to the lessee's federal, state, and local personal property and income taxes. (*Id.*) Further limiting Kumeyaay Wind's capabilities, that project did not have the benefit of a connection to the larger southern California grid, as the Sunrise Powerlink had not yet been constructed. (*Id.*)

### 4.   Plaintiff Opposes the Tribe's Expansion of Its Kumeyaay Wind Project.

In 2007, the Tribe commenced planning the expansion of the Kumeyaay Wind project in the context of a larger, more comprehensive plan for the Reservation that blends development of the wind resources and other community goals. (*Id.* at ¶ 53.) The Kumeyaay Wind II project was designed to use the Tribe's long-term Energy Vision, which is to maximize the development of its wind resources in a manner that sustains and enhances the community environmentally, culturally, socially and economically. (*Id.*)

In preparing for the Kumeyaay Wind II project, the Tribe selected and worked with private partners for years to develop necessary environmental studies, permitting and clearances; testing of wind speed and direction for turbine size and efficiency; engineering and design drawings (power purchase, interconnection and build-own transfer agreements); gaining California Public Utilities Commission ("CPUC") and BIA approvals; financing agreements; developing a Tribal Energy Resources Agreement ("TERA") for environmental and leasing authority; cooperative agreements with state and local governments; land use and master plan amendments; business and job training; and operational and maintenance planning. (*Id.* at ¶ 25.)

DOCS 113061-00000011/4293113.7

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CAMPO
BAND OF DIEGUENO MISSION INDIANS' MOTION TO DISMISS
CASE NO. 3:20-cv-02343-JLS-DEB

Throughout this process, Plaintiff Backcountry Against Dumps tried to stop the project and preclude the Tribe from developing its wind energy despite its former representation that it would not oppose any non-landfill Tribal projects. (*Id* at ¶ 49.)

Once again, the project ultimately failed due largely to a significant misinformation campaign (*Id.*)

### 5. Plaintiff Opposes the Tribe's Sale of Water to a Utility Project.

In addition to the foregoing economic initiatives, the Tribe also pursued a water sale to a large utility project to shore up its income. Here too, the Tribe was met with opposition from Plaintiff Back Country Against Dumps. (*Id.* at ¶ 54.)

The constant (and costly) opposition by local self-interested individuals to prevent tribal economic development on the Reservation has depressed the Tribe's opportunities to ameliorate its Members' state of poverty and the Reservation's disrepair.

Those willing to develop projects on the Reservation, given the uncertainties and limited infrastructure, are few, and the types of economic development projects that can succeed on the Reservation are rare. (*Id.* at ¶ 22.) Those projects that are consistent with the Tribe's values and policies to engage in economic development that supports renewable energy and self-determination, are even more so. (*Id.*)

### C. THE PROJECT IS THE REALIZATION OF THE TRIBE'S ENERGY VISION AND THE PRIMARY SOURCE OF FUNDS FOR THE TRIBE'S GOVERNMENT OPERATIONS

Following the foregoing economic pursuits, the Tribe has finally been able to realize its long-term Energy Vision through the BIA-approved Lease and Project with Terra-Gen. Indeed, the Tribe is currently receiving benefits from the Lease which has allowed it to accomplish its most urgent and immediate needs outlined in its General Welfare Program. The remaining ongoing benefits due under the Lease will allow the Tribe to realize its long-held goal of furnishing benefits provided for in its General Welfare Program to its Tribal Members.

12

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CAMPO
BAND OF DIEGUENO MISSION INDIANS' MOTION TO DISMISS
CASE NO. 3:20-cv-02343-JLS-DEB

DOCS 113061-00000011/4293113.7

Plaintiffs' lawsuit asks this Court to invalidate the BIA-approved Lease and prevent the construction and operation of the Project. That result would be calamitous for the Tribe causing the cessation of financial benefits currently being paid to the Tribe along with income over the life of the Project, which will fund the General Welfare Program. It goes without saying that the instant lawsuit materially impacts the Tribe's interests in the Lease and Project.

The renewable energy project to be constructed by Terra-Gen is unique in that it is one of the few economic development projects where the Reservation's rural location is an asset, not an impediment to success, and is a project that aligns with the Tribe's values and renewable energy policies. (*Id.* at ¶ 27.) The Project will develop and diversify the Tribe's economy and generate significant economic benefits for the Tribe. (*Id.* at ¶ 32.) These benefits include, *inter alia*, jobs for Tribal Members and a consistent revenue source derived from payments and rents under the Lease. (*Id.*)

The Tribe has already begun realizing the benefits of the Project, including interim payments, a scholarship program, and job opportunities. (*Id.* at ¶ 33.) To date, the Tribe has received over a million dollars in the form of direct rents and payments allocated to its General Welfare Program as a result of the Lease. This income has been used to provide general welfare benefits under the Tribe's General Welfare Ordinance, which has been proven to be especially critical during the COVID-19 pandemic. (*Id.* at ¶ 34.) An additional payment is due to the Tribe in April 2021. (*Id.*)

The Project has also resulted in a scholarship program to pursue higher education and training. (*Id.* at ¶ 35.) To date, fifteen scholarships have been issued to Tribal Members. (*Id.*) The Project has also resulted in increased job opportunities and currently employs approximately fourteen Tribal Members, providing hundreds of thousands of dollars in wages to date, in jobs involving environmental review, protection of cultural resources, and other preliminary field investigations. (*Id.* at ¶ 36.)

As construction of the Project progresses, and once the Project becomes operational, the Project will provide continuing job opportunities for Tribal Members including operational, monitoring, management and skilled maintenance jobs. (*Id.* at ¶ 39.) The Lease for the Project requires Terra-Gen to give hiring preference to Tribal Members for jobs related to the Project. (*Id.* at ¶ 40.)

Construction of the Project will also provide ancillary Tribal benefits, including the development and use of a tribal batch plant, traffic control, temporary housing for workers, licensing of temporary businesses, and project biological and cultural monitoring jobs. (*Id.*) The Project will also provide a Fire Protection Plan that will provide funds for firefighting and emergency medical resources, significant new equipment to the Campo Reservation Fire Department to increase its fire and emergency readiness for incidents on and near the Reservation, including water tanks for firefighter use. (*Id.* at ¶ 41.)

The Project will generate tens of millions of dollars for the Tribal government in rent, royalties, and other payments, including most that only accrue upon Project Operation. (*Id.* at ¶ 38.) The Tribe estimates that it will receive sufficient monies to fund the Tribe's programs and services through its General Welfare Ordinance as a result of the Project. (*Id.*)

***The revenue expected to be generated by the Project will become the primary funding source for the Tribal government.*** (*Id.* at ¶ 37.) The annual revenue from the Project would multiply the Tribe's total annual revenue, enabling the Tribe to fully fund the programs and services under the General Welfare Ordinance, will support developing and increased infrastructure on the Reservation, and will support further economic development ventures. (*Id.*) The Lease also provides for an option to purchase the improvements upon the expiration of the 25-year term, thus providing continual long-term benefits to the Tribe and securing the Tribe's long-term commitment to using its land to generate renewable energy for current and future generations. (*Id.* at ¶ 42.)

In light of the opportunities and benefits the Project would provide to the Tribe, on April 3, 2018, the Tribe's General Council adopted Resolution No. 04-03-2018-01, which approved the 25-year Lease with Terra-Gen for the Project. (*Id.* at ¶ 29.) Because the Project is located on trust land, the Lease was submitted to BIA for review in accordance with 25 U.S.C. § 415 and 25 C.F.R. Part 162. (*Id.* at ¶ 30.) The BIA undertook an extensive environmental review and published a Draft EIS, and thereafter a Final EIS, under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4347. The BIA also hosted public meetings and responded to public comments on the Draft EIS and Final EIS. (*Id.*) On April 7, 2020, Defendant U.S. Department of the Interior's Assistant Secretary for Indian Affairs signed the Record of Decision authorizing BIA approval of the Lease, and then approved the revised and restated Lease between Terra-Gen and the Tribe on May 4, 2020. (*Id.*)

While this Project is clearly not a landfill, Plaintiff Backcountry Against Dumps has cemented its modus operandi by bucking its prior representations to the Tribe and yet again opposing any economic development of the Reservation lands to pursue their own apparent desire to have nothing built next door to them at the expense of the Tribal Community.

If the agency decisions challenged here were to be vacated in this litigation, the Tribe would not only lose the current benefits received under the Lease and from the Project, but also the ongoing revenue over the life of the Project, the government services and programs such revenue will support, and the prospect of future Tribal development ventures. (*Id.* at ¶ 43.) In addition to the barriers and impediments to economic developments discussed *supra*, the COVID-19 pandemic continues to hinder potential economic development. (*Id.* at ¶ 46.) As a result, the Tribe does not have any other projects in the short term that could replace the income received, and to be received, from the Project. (*Id.*) The Tribe has been challenged for decades in its attempts to have the resources to self-govern and provide the necessary programs and resources for its Tribal citizens and their families to see a better future and progress

15

into an era of sustainable health and welfare. (*Id.* at ¶ 17.) The current wind Project is the vehicle to bring the Tribe to that goal. (*Id.*)

## III.

## ARGUMENT

### A.   LEGAL STANDARDS

Rule 19 requires that an absent party be joined when litigation may impair its ability to protect its interest. Where a required party cannot feasibly be joined, equity and good conscience may require dismissal of the action. *See Diné Citizens Against Ruining Our Env't v. Bureau of Indian Affairs*, 932 F.3d 843, 851 (9th Cir. 2019), *cert. denied*, 141 S. Ct. 161 (2020) (citing Fed. R. Civ. P. 19(a), 19(b) and 12(b)(7)).

"Whether an action should be dismissed under Rule 19 involves a two-part analysis." *Kescoli v. Babbitt*, 101 F.3d 1304, 1309 (9th Cir. 1996). "First, the district court must determine whether the absent party is a 'necessary party.'" *Id.* Rule 19(a) guides this determination, requiring that "if feasible" an entity "must be joined" if the entity "claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may. . . as a practical matter impair or impede the person's ability to protect the interest." Fed. R. Civ. P. 19(a)(1)(B)(i). "If the absent party is necessary and cannot be joined, the court next must determine whether the party is 'indispensable.'" *Id.* "Under Rule 19, if the party 'who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed.'" *Diné Citizens*, 932 F.3d at 851. (quoting Fed. R. Civ. P. 19(b)). "If it cannot proceed, a motion to dismiss under Rule 12(b)(7) for failure to join a party is properly granted." *Id.*

"Rule 19 is designed to protect the interests of absent parties, as well as those ordered before the court, from multiple litigation, inconsistent judicial determinations or the impairment of interests or rights." *CP Nat'l Corp. v. Bonneville Power Admin.*, 928 F.2d 905, 911 (9th Cir. 1991). When ruling on a motion to dismiss under Rule

16

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CAMPO
BAND OF DIEGUENO MISSION INDIANS' MOTION TO DISMISS
CASE NO. 3:20-CV-02343-JLS-DEB

DOCS 113061-00000011/4293113.7

12(b)(7), the court "accept[s] as true the allegations in Plaintiff's complaint and draw[s] all reasonable inferences in Plaintiff's favor." *Paiute-Shoshone Indians of Bishop Community of Bishop Colony, Cal. v. City of Los Angeles*, 637 F.3d 993, 996 n. 1 (9th Cir. 2011). However, the inquiry under Rule 19(a) is practical and fact specific (*White v. Univ. of Cal.*, 765 F.3d 1010, 1026 (9th Cir. 2014), and "the court may consider evidence outside the pleadings." *Camancho v. Major League Baseball*, 297 F.R.D. 457, 460-61 (S.D. Cal. 2013) (quoting *McShan v. Sherrill*, 283 F.2d 462, 464 (9th Cir. 1960)).

## B.   THE TRIBE IS A REQUIRED PARTY

"Under Rule 19(a)(2)(i), absent parties are necessary if they 'claim[] an interest relating to the subject of the action and [are] so situated that the disposition of the action in the [parties'] absence may . . . as a practical matter impair or impede the [parties'] ability to protect that interest.'" *Kescoli*, 101 F.3d at 1309 (quoting Fed. R. Civ. P. 19(a)(2)(i)).

### 1.   The Tribe Has an Interest in the Action That Will Be Impaired Absent the Tribe's Involvement

"To satisfy Rule 19, an interest must be legally protected and must be 'more than a financial stake.'" *Diné Citizens*, 932 F.3d at 852 (quoting *Makah Indian Tribe v. Verity*, 910 F.2d 555, 558 (9th Cir. 1990)). "[A]n interest that 'arises from terms in bargained contracts' may be protected, but . . . such an interest [must] be 'substantial.'" *Cachil Dehe Band of Winturn Indians of the Colusa Indian Cmty. v. California*, 547 F.3d 962, 970 (9th Cir. 2008) (quoting *Am. Greyhound Racing, Inc. v. Hull*, 305 F.3d 1015, 1023 (9th Cir. 2002)). "If a legally protected interest exists, the court must further determine whether that interest will be *impaired or impeded* by the suit." *Diné Citizens*, 932 F.3d at 852 (quoting *Makah*, 910 F.2d at 558) (emphasis in original).

The Ninth Circuit has found that sovereign Indian tribes are necessary parties to litigation seeking to overturn federal agencies' approvals of projects on tribal land. For example, in *Diné Citizens*, the plaintiffs challenged federal agency actions granting

17

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CAMPO BAND OF DIEGUENO MISSION INDIANS' MOTION TO DISMISS CASE NO. 3:20-cv-02343-JLS-DEB

DOCS 113061-00000011/4293113.7

entitlements for a power plant and coal mine on land reserved to the Navajo Nation, and alleged that the agencies' actions violated NEPA and the Endangered Species Act. 932 F.3d at 847. ***Like in this case, the Diné Citizen plaintiffs sought to invalidate BIA approval of a lease amendment extending the term by 30 years and rights-of-way*** (in addition to other permits). *Id.* at 853. The court found that the tribe had "a legally protected interest in the subject matter of [the] suit that would be impaired in its absence." *Id.* at 852.

The court recognized, that "(a)lthough Plaintiffs' challenge is to Federal Defendants' NEPA and ESA processes (rather than to anything that [the tribe] has done), it does not relate only to the agencies' future administrative process, but instead may have retroactive effects on approvals already granted for mining operations." *Id.* at 853. Rejecting the plaintiffs' attempt to characterize the relief they sought as solely prospective in nature, the Ninth Circuit in *Dine Citizens* found that, "[i]f Plaintiffs succeeded in their challenge and the agency actions were vacated, [tribal] interest in the existing lease, rights-of-way, and surface mining permits would be impaired," the project could not operate, and the tribe "would lose a key source of revenue." *Id.* at 853.

Similarly, in *Kescoli*, the plaintiff challenged the Department of the Interior's modification of a special condition related to leases for mining operations entered into with the Navajo Nation and the Hopi Tribe. 101 F.3d at 1307. The court recognized that the tribes were necessary parties because the plaintiff's challenge affected the conditions of the project, thus affecting the mining operator's mining operations under the lease agreements with the tribes. *Id.* at 1309. The court recognized that "[i]n turn, this could affect the amount of royalties received by the [tribes] and employment opportunities for their members." *Id.* at 1309-10. The court further recognized that the tribes, "by virtue of their sovereign capacity, have an interest in determining what is in their best interests by striking an appropriate balance between receiving royalties from the mining and the protection of their sacred sites." *Id.* at 1310.

Here, as in *Diné Citizens*, the action brought by Plaintiffs, if successful, will impair the Tribe's legally protected interest in the Lease between the Tribe and Terra-Gen, stop the Project, prevent the Tribe from receiving its benefits, and frustrate the Tribe's ability to "use its natural resources as it chooses." *See* 932 F.3d at 853, 857. And just as in *Diné Citizens*, it is not possible to "tailor the scope of relief available to being prospective only, preventing any impairment to a legally protected interest. *Id.* at 853. Indeed, any changes to the conditions of the Project, timing of Project development, or determination that the Federal Defendants' approvals must be vacated and remanded for further determination, will directly impact Terra-Gen's ability to construct and operate the Project as contemplated under the Lease. In turn, the Tribe will lose a substantial source of revenue (tens of millions of dollars), and will be deprived of a new, significant source of jobs for the Tribe's members. Like in *Diné Citizens* and *Kescoli*, Plaintiffs' action will affect the already-negotiated and approved lease and ongoing and expected jobs and revenue. *See id.* Without the Project, the Tribe is unable to fund its General Welfare Program. Thus, a large percentage of Tribal Members will continue to live below the poverty line because the relief Plaintiffs seek will prevent the Tribe from providing sufficient aid.

### 2.  <u>Existing Parties Will Not Adequately Represent the Tribe's Interests</u>

A determination under Rule 19(a)(1) that an absent party's ability to protect its interest will be impaired, requires valuation of whether the existing parties will adequately represent the absent party's interest. *Diné Citizens*, 932 F.3d at 852. The Ninth Circuit considers three factors in this analysis:

> [1] whether the interests of a present party to the suit are such that it will undoubtedly make all of the absent party's arguments; [2] whether the party is capable of and willing to make such arguments; and [3] whether the absent party would offer any necessary element to the proceedings that present parties would neglect.

*Diné Citizens*, 932 F.3d at 852 (quoting *Alta v. Black*, 738 F.3d 1111, 1127-28 (9th Cir. 2013).

In *Diné Citizens*, the Ninth Circuit determined that the interests of the federal government differ from those of a sovereign tribe such that the "Federal Defendants cannot be counted on to adequately represent [the tribe's] interests." 932 F.3d at 855. The court reasoned, that "[a]lthough Federal Defendants have an interest in defending their decisions, their overriding interest . . . must be in complying with environmental laws such as NEPA and the ESA." *Id.* The Ninth Circuit found that the federal government's "interest differs in a meaningful sense from [the tribe's] sovereign interest in ensuring that the [project facilities] continue to operate and provide profits to the [tribe]." Thus, the Ninth Circuit observed that "[i]f the district court were to hold that NEPA or the ESA required more analysis that would delay mining activities, or that one of the federal agencies' analyses underlying the approval was flawed, Federal Defendants' interests might diverge from that of [the tribe]." *Id.*

While the "BIA holds a fiduciary relationship to Indian tribes, and its management of tribal [interests] is subject to the same fiduciary duties," (*McDonald v. Means*, 309 F.3d 530, 538 (9th Cir. 2002)), the BIA's obligations to act in furtherance of the Tribe's interest does not extend to the Tribe's contractual obligations or management duties for its tribal land. *See, e.g.*, *United States v. Algoma Lumber Co.*, 305 U.S. 415, 419-22 (1939) (recognizing that the United States has "no beneficial ownership in the tribal lands or their proceeds, and however we may define the nature of the legal interest acquired by the government as the implement of its control, substantial ownership remained with the tribe as it existed before the treaty").

The Tribe indisputably has a legally protected interest in the signed and BIA-approved Lease and an interest in its own self-governance, economic development and General Welfare Program. Although the Tribe and the Federal Defendants currently share the same posture of defending the challenged approvals, just as in *Diné Citizens*, the Tribe's interests unequivocally differ from the Federal Defendants' interest, which is to ensure compliance with federal environmental regulations. 932 F.3d at 855. And like the Ninth Circuit observed in *Diné Citizens*, the Federal Defendants "do not share

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CAMPO BAND OF DIEGUEÑO MISSION INDIANS' MOTION TO DISMISS CASE NO. 3:20-cv-02343-JLS-DEB

DOCS 113061-00000011/4293113.7

an interest in the *outcome* of the approvals—the continued operation of [the project.]" *Id.* As such, the Tribe's interests cannot be adequately represented by the Federal Defendants in this litigation.

Further, Terra-Gen cannot adequately represent the Tribe's sovereign interests at stake in this litigation. As a self-governing Tribe, the Tribe strategically decided to develop its wind resources vis-à-vis its Energy Vision, which the Project fulfills and will provide the primary source of funding for the Tribe.  While Terra-Gen undoubtedly has a financial interest in the outcome of the Project and this litigation, Terra-Gen does not share the Tribe's sovereign interest in controlling its resources nor the benefit of the Tribe's economic development decisions. *See Diné Citizens,* 932 F.3d at 855-56 (explaining that although commercial operator and co-owner of the project at issue shared a financial interest in the outcome of the case, it could not represent the tribe's sovereign interests).

As a result of the foregoing facts, none of the other Parties to this action can represent the interests of the Tribe and thus, the Tribe is a required party within the meaning of Rule 19.

## C. <u>THE TRIBE CANNOT BE JOINED</u>

The next step in the Rule 19 inquiry is to determine whether the Tribe can be feasibly joined as a party to this litigation. *See Diné Citizens*, 932 F.3d at 856. Here, the Tribe cannot be joined as a party due to tribal sovereign immunity.

"Indian tribes are 'domestic dependent nations' that exercise inherent sovereign authority over their members and territories. Suits against Indian tribes are thus barred by sovereign immunity absent a clear waiver by the tribe or congressional abrogation." *Jamul Action Committee v. Simermeyer*, 974 F.3d 984, 991 (9th Cir. 2020) (quoting *Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Okla.*, 498 U.S. 505, 509 (1991)); *Dawavendewa v. Salt River Project Agr. Imp. & Power Dist.*, 276 F.3d 1150, 1159 (9th Cir. 2002) ("Federally recognized Indian tribes enjoy sovereign immunity from suit, and may not be sued absent an express and unequivocal waiver

21

of immunity by the tribe or abrogation of tribal immunity by Congress"). "Tribal sovereign immunity extends to both the governmental and commercial activities of a tribe, whether undertaken on or off its reservation." *Jamul*, 974 F.3d at 991. A tribal nation's sovereign immunity, "like all others, is subject to the superior and plenary control of Congress. But 'without congressional authorization,' the 'Indian Nations are exempt from suit.'" *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58 (1978) (quoting *United States v. United States Fidelity & Guaranty Co.*, 309 U.S. 506, 512 (1940). "It is settled that a waiver of sovereign immunity 'cannot be implied but must be *unequivocally expressed*.'" *Id.* (quoting *United States v. Testan*, 424 U.S. 392, 399 (1976)) (emphasis added).

Congress has not abrogated any aspect of the Tribe's sovereign immunity with respect to the issues raised in this action, nor has the Tribe waived its sovereign immunity here. *See Diné Citizens*, 932 F.3d at 856;  Cuero Decl., ¶ 57. Accordingly, joinder is not possible.

## D.   THE ACTION CANNOT PROCEED IN EQUITY AND GOOD CONSCIENCE WITHOUT THE TRIBE

To determine whether an action may fairly proceed without a required party, Rule 19 establishes four non-exclusive factors:

(1) the extent to which a judgment rendered in the [party's] absence might prejudice that [party] or the existing parties;

(2) the extent to which any prejudice could be lessened or avoided by:

    (A) protective provisions in the judgment;

    (B) shaping the relief; or

    (C) other measures;

(3) whether a judgment rendered in the [party's] absence would be adequate; and

(4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

*Diné Citizens*, 932 F.3d at 857 (quoting Fed. R. Civ. P. 19(b)); *Republic of Philippines v. Pimentel*, 554 U.S. 851, 862 (2008).

22

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CAMPO BAND OF DIEGUENO MISSION INDIANS' MOTION TO DISMISS CASE NO. 3:20-CV-02343-JLS-DEB

DOCS 113061-00000011/4293113.7

While a court should be "extra cautious" before dismissing an action where no alternative forum exists, "[i]f the necessary party is immune from suit, there may be 'very little need for balancing Rule 19(b) factors because immunity itself may be viewed as the compelling factor.'" *Kescoli v. Babbitt*, 101 F.3d 1304, 1311 (9th Cir. 1996) (quoting *Confederated Tribes v. Lujan*, 928 F.2d 1496, 1499 (9th Cir. 1991)).

> Indeed, . . . there is a "wall of circuit authority" in favor of dismissing actions in which a necessary party cannot be joined due to tribal sovereign immunity—"***virtually all the cases to consider the question appear to dismiss under Rule 19***, regardless of whether [an alternate] remedy is available, ***if the absent parties are Indian tribes invested with sovereign immunity***."

*Diné Citizens*, 932 F.3d at 857 (quoting *White*, 765 F.3d at 1028) (emphasis added).

### 1.    The Tribe Will Suffer Prejudice If the Litigation Continues

"Prejudice, the first factor in the Rule 19(b) analysis, 'largely duplicates the consideration that made a party necessary under Rule 19(a).'" *Diné Citizens*, 932 F.3d at 857 (quoting *Am. Greyhound Racing, Inc.*, 305 F.3d at 1025). Prejudice dictates dismissal here. In *Diné Citizens*, the Ninth Circuit recognized that the tribe would be prejudiced if the plaintiffs were likely to prevail—at stake was millions of dollars in revenue for the tribe, as well as the tribe's ability to use its natural resources how it chooses. *Id.*

The same is true here. Should the Plaintiffs succeed on the merits of its claims, the Tribe will stand to lose millions of dollars in continued revenue, as well a significant number of high-paying jobs. Additionally, the Tribe will be deprived of the opportunity to use its land and its natural resources how it chooses—to produce renewable energy to support the Tribe and the surrounding community.

### 2.    Relief Cannot Be Shaped in a Way to Avoid Prejudice to the Tribe

The second factor also favors dismissal. When reviewing similar claims arising from NEPA and the ESA, the Ninth Circuit recently recognized, that although remanding the challenged decisions without vacatur could potentially "avoid prejudice

23

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CAMPO
BAND OF DIEGUENO MISSION INDIANS' MOTION TO DISMISS
CASE NO. 3:20-CV-02343-JLS-DEB

DOCS 113061-00000011/4293113.7

in the short term," "the [tribe] inevitably would be prejudiced if Plaintiffs ultimately succeeded and if, after further NEPA and ESA processes, Federal Defendants were not able to come to the same decisions without imposing new restrictions or requirements on the [project]." *Diné Citizens*, 932 F.3d at 858.

Here, the Tribe would suffer the same prejudice. If the Plaintiffs are to succeed on their claims, and the Federal Defendants engaged in further environmental review and were unable to arrive at the same decisions without imposing new restrictions or requirements to the Project, the Tribe will be prejudiced. Additionally, the delay associated with further review of the Project will prejudice the Tribe, which is reliant on the income that will be derived from the Project. The Tribe has already received significant benefits from the Project, which it is relying on in order to fund the programs designed to ensure the welfare of Tribal Members.

### 3.   The Court Should Dismiss This Action, Even If Plaintiffs Are Without an Alternative Remedy

The Tribe recognizes that the third factor (whether judgment rendered in absence of the Tribe would be adequate) weighs against dismissal. A judgment rendered in the absence of the Tribe "would not create conflicting obligations, because it is Federal Defendants' duty, not [the Tribe's], to comply with NEPA and the ESA." *Diné Citizens*, 932 F.3d at 858. Additionally, assuming *arguendo* that the fourth factor (whether Plaintiffs would have an adequate remedy if the action were dismissed) also weighs against dismissal, the Court should still dismiss the action. In upholding dismissal in *Dine Citizens*, the Ninth Circuit "recognized that the lack of an alternative remedy 'is a common consequence of sovereign immunity'" but that the court has "regularly held that the tribal interest in immunity overcomes the lack of an alternative remedy or forum for the plaintiffs." 932 F.3d at 858 (citing *Am. Greyhound Racing, Inc.*, 305 F.3d at 1025). Thus, although the Ninth Circuit assumed both the third and fourth factors weighed against dismissal, the Ninth Circuit concluded that the "litigation cannot, in good conscience, continue in [the Tribe's] absence," given "the

24

'wall of circuit authority' in favor of dismissing an action where a tribe is a necessary party." *Id.* (quoting *White*, 765 F.3d at 1028).

In light of the Tribe's sovereign immunity and the prejudice it will suffer if this action proceeds, the action should not, in good conscience, continue in the Tribe's absence.

## E. THE PUBLIC RIGHTS EXCEPTION DOES NOT APPLY

The Tribe anticipates that Plaintiffs will urge the Court to apply the public rights exception in order to proceed with this action in the Tribe's absence. "The public rights exception is a limited 'exception to traditional joinder rules' under which a party, although necessary, will not be deemed 'indispensable,' and the litigation may continue in the absence of that party." *Diné Citizens*, 932 F.3d at 858 (quoting *Conner v. Burford*, 848 F.2d 1441, 1459 (9th Cir. 1988)). "The public rights exception is reserved for litigation that 'transcend[s] the private interests of the litigants and seek[s] to vindicate a public right." *Id.* (quoting *Kescoli*, 101 F.3d at 1311). "The public rights exception may apply in a case that could adversely *affect* the absent parties' interests, but 'the litigation must not *destroy* the legal entitlements of the absent parties for the exception to apply." *Id.* (internal quotations omitted) (emphasis in original).

The Ninth Circuit has routinely declined to apply the public rights exception in actions involving impairment to existing leases of tribal land. *See id.* at 859-60. In *Kescoli*, the Ninth Circuit stated, "if the action proceeded in the absence of the Navajo Nation and the Hopi Tribe, the rights of their members under the lease agreements could be significantly affected." *Kescoli*, 101 F.3d at 1311-12. "The litigation also threaten[ed] the Navajo Nation's and the Hopi Tribe's sovereignty by attempting to disrupt their ability to govern themselves and to determine what is in their best interests [by] balancing potential harm caused by the mining operations against the benefits of the royalty payments." *Id.* at 1312. In such a situation, the litigation was "not limited to ensuring an agency's future compliance with statutory procedures," and was "not one in which the risks of prejudice to the Navajo Nation and the Hopi Tribe [was]

25

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CAMPO
BAND OF DIEGUENO MISSION INDIANS' MOTION TO DISMISS
CASE NO. 3:20-cv-02343-JLS-DEB

DOCS 113061-00000011/4293113.7

nonexistent or minimal." *Id.*

Like the legal entitlements threatened in *Kescoli* and *Diné Citizens*, Plaintiffs seek to invalidate the Lease the Tribe has entered into with Terra-Gen for the development of renewable energy facilities on the Tribe's property. The Tribe has determined what is in its best interests by balancing the potential harm caused by the Project with the benefits of the royalty payments and jobs the Tribe will receive under the Lease. At this stage, the question "must be whether the litigation *threatens* to destroy" the Tribe's approvals. *Diné Citizens*, 932 F.3d at 860 (emphasis in original). The rights of the Tribe's members "*could* be significantly affected," and the Court should not apply the public rights exception. *Id.* (quoting *Kescoli*, 101 F.3d at 1311-12) (emphasis in original); *see also Shermoen v. United States*, 982 F.2d 1312, 1319 (9th Cir. 1992) ("Because of the threat to the absent tribes' legal entitlements, and indeed to their sovereignty, posed by the present litigation, application of the public rights exception . . . would be inappropriate").

The Ninth Circuit recognized that refusing to apply the public rights exception "arguably 'produce[s] an anomalous result' in that '[n]o one, except [a] Tribe, could seek review of an environmental impact statement covering significant federal action relating to leases or agreements for development of natural resources on [that tribe's] lands." *Diné Citizens*, 932 F.3d at 860-61 (quoting *Manygoats v. Kleppe*, 558 F.2d 556, 559 (10th Cir. 1977)). "This result, however, is for Congress to address, as it should see fit, as only Congress may abrogate tribal sovereign immunity." *Id.* at 861 (citing *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 790 (2014)). Congress has not done so, and the public rights exception does not apply where, as here, the litigation threatens to destroy the Tribe's legal approvals. *Id.* Accordingly, the Court should dismiss this action.

1

## IV.

## __CONCLUSION__

For the reasons stated above, the Campo Band of Mission Indians respectfully requests that the Court dismiss this action with prejudice.


DATED: March 3, 2021        PROCOPIO, CORY, HARGREAVES
                              & SAVITCH LLP


By: */s/Rebecca L. Reed*
         Rebecca L. Reed
         Justin M. Fontaine
         Attorneys for Intervenor-Defendant
         CAMPO BAND OF DIEGUENO
         MISSION INDIANS