1  Rebecca L. Reed (Bar No. 275833)
   E-mail:      rebecca.reed@procopio.com
2  Justin M. Fontaine (Bar No. 323357)
   E-mail:      justin.fontaine@procopio.com
3  PROCOPIO, CORY, HARGREAVES
       & SAVITCH LLP
4  525 B Street, Suite 2200
   San Diego, CA 92101
5  Telephone: 619.238.1900
   Facsimile: 619.235.0398
6
   Attorneys for Proposed Intervenor-Defendant
7  CAMPO BAND OF DIEGUENO MISSION
   INDIANS
8

9              UNITED STATES DISTRICT COURT

10        FOR THE SOUTHERN DISTRICT OF CALIFORNIA

11

12 | BACKCOUNTRY AGAINST DUMPS;  | Case No. 3:20-cv-02343-BEN-DEB
   | DONNA TISDALE; and JOE E.
   | TISDALE,                    | **DECLARATION OF MARCUS**
13 |                             | **CUERO IN SUPPORT OF**
   |                             | **CAMPO BAND OF DIEGUENO**
14 |        Plaintiffs,          | **MISSION INDIANS' MOTION**
   |                             | **TO DISMISS**
15 | v.
   |                             | Ctrm.:    4D
16 | UNITED STATES BUREAU OF     | Judge:    Hon. Janis L. Sammartino
   | INDIAN AFFAIRS; DARRYL
17 | LACOUNTE, in his official capacity as | Complaint Filed:   July 8, 2020
   | Director of the United States Bureau of | Trial Date:        Not set
18 | Indian Affairs; AMY DUTSCHKE, in
   | her official capacity as Regional Director
19 | of the Pacific Region of the United States
   | Bureau of Indian Affairs; UNITED
20 | STATES DEPARTMENT OF THE
   | INTERIOR; DAVID BERNHARDT, in
21 | his official capacity as Secretary of the
   | Interior; and TARA SWEENEY, in her
22 | official capacity as Assistant Secretary of
   | the Interior for Indian Affairs,
23 |
   |        Defendants.
24

25

26

27

28

I, Marcus Cuero, declare as follows:

1.      I am the duly elected Chairman of the Campo Band of Diegueno Mission Indians, otherwise known as the Campo Kumeyaay Nation ("Campo" or "Tribe").

2.      I have served in the capacity as Campo's Chairman since May 2020 and prior to that time I served on the Campo Tribe's Executive Committee, including as the Tribe's treasurer.

3.      The Campo Executive Committee is empowered to represent the Tribe in all negotiations and relationships between the Tribe and local State and Federal Governments or Agencies, and all other organizations and agencies that may have relationship with the Tribe.

4.      I have personal knowledge of the facts set forth herein and if called as a witness, I could and would testify competently to the matters contained herein.

5.      Campo is a federally recognized tribe comprised of Kumeyaay people, consisting of approximately 310 enrolled citizens ("Tribal Members").

6.      The Tribe is governed by the General Council of the Tribe pursuant to the Constitution of the Campo Band of Mission Indians, adopted by the Tribal Members on July 13, 1975, and approved by the Regional Director, Bureau of Indians Affairs on January 20, 1976 ("Constitution").

7.      The Campo Indian Reservation ("Reservation"), established in 1893, currently comprises 16,512 acres of land located in eastern San Diego County, and is home to over 500 individuals, including Tribal Members and their families.

8.      The Reservation contains little opportunity for self-generated economic development, with its available resources limited to non-arable land, wind, and sun.

9.      The Tribe, through the General Council, exercises sovereign authority over the Reservation and its Tribal Members.  The General Council consists of all Tribal Members eighteen (18) years of age or older.  The Tribe is represented by a seven-member Executive Committee, elected by the General Council.

10.     The Tribe's government has had to adapt and adjust to ever-changing

2

DOCS 113061-00000011/4349851.8

1   Federal policies with respect to Indian tribes (including physical and cultural genocide,

2   and theft of land and resources), and throughout those changing policies, the Tribe has

3   fought to maintain its inherent sovereign authority over its Reservation and Tribal

4   Members.  This is because the Tribe's retained sovereignty over the Reservation and

5   its Tribal Members is more than just exercising political or governmental power, rather

6   it is the key to the Tribe preserving, revitalizing and perpetuating its cultural identity.

7        11.    Our Tribal elders remember in the 1950s when the United States had a

8   widespread program to terminate Indian tribes, where County agencies, linked with

9   the school districts, sought to remove Indian children from their homes and adopt them

10  out.  Many parents had no knowledge of their legal rights and many did not even speak

11  English.  Children would go to school and never return.  The County excused their

12  actions by pointing to the poverty and substandard housing on the Reservation as

13  justification for removing the children.  This memory has driven our Tribe to ensure

14  that such a period never happen again and we will never allow such rationale to be

15  used.

16       12.    The Campo tribal government has the difficult task of not only rebuilding

17  our tribal government, but also addressing the needs of our tribal people resulting from

18  historical trauma as well as existing conditions on the Reservation.

19       13.    The Campo tribal government has the responsibility to provide

20  governmental and culturally-relevant social services to its tribal community.  These

21  services include, but are not limited to fire and emergency services, access to utility

22  services and telecommunications, waste management, water well testing and

23  maintenance, septic tank maintenance, environmental protection, natural habitat

24  restoration and maintenance, housing, land use planning, road maintenance and

25  development, social services, water and sewer needs, educational services, and cultural

26  education, preservation and development programs and tribal religious and funerary

27  events.  In addition, the government is responsible for and maintains locations for

28  community gatherings including its Tribal Center, recreation center, education facility,

1    church and cemetery areas.  The government incurs costs for each of these services.

2    14.    The Tribe has developed a General Welfare Ordinance designed to set a

3 direction to help Tribal Members address essential needs, including utilities,

4 infrastructure, housing (e.g., rental assistance, home rehabilitation assistance),

5 education (e.g., tuition costs, supplies, and transportation costs), transportation to

6 essential services, elder and disable persons programs (e.g., meal assistance, home

7 care, and transportation), child day-care, cultural immersion and involvement (e.g.,

8 expenses related to attending and participating in cultural and religious ceremonies)

9 and end of life traditions.  The Tribe is unable to fund many of these programs and

10 services authorized by the General Welfare Ordinance due to inadequate tribal

11 government income.

12    15.    The Tribe's government services have historically relied nearly entirely

13 on limited federal funding to provide governmental and social services; however,

14 federal funding is not consistent and the limitations and restrictions on such funding

15 can be overly burdensome.  As a result, our services and needs remain unfulfilled.

16    16.    Unlike state and local governments, the Tribe does not have the benefit

17 of a broad property tax system to create a tax base to generate revenue; therefore,

18 independent tribal economic development is critical for the Tribe to gain income to

19 provide the much needed governmental and social services to our Tribal Members and

20 residents, including housing, healthcare, social services, recovery programs, training

21 and educational opportunities, cultural programs, and other general welfare benefits.

22    17.    The Tribe has been challenged for decades in its attempts to have the

23 resources to self-govern and provide the necessary programs and resources for its

24 Tribal citizens and their families to see a better future and progress into an era

25 sustainable health and welfare.  The current wind Project at issue in this litigation is

26 the vehicle that can bring us to this goal.

27    18.    Census data suggests approximately 53%-62% of the population on the

28 Reservation was living below the poverty level in 2010.  This condition has not

4

DECLARATION OF MARCUS CUERO IN SUPPORT OF
CAMPO BAND OF DIEGUENO MISSION INDIANS' MOTION TO DISMISS
CASE NO. 3:20-cv-02343-JLS-DEB

DOCS 113061-00000011/4349851.8

1   changed in the ensuing ten years and well exceeds the average poverty percentage of

2   15% for San Diego County.

3        19.    Job opportunities on the Reservation are limited, and the Reservation's

4   rural location, with no reliable public transportation, severely hinders Tribal Members'

5   access to job opportunities elsewhere.  This problem is worsened for Tribal Members

6   requiring child care if they are to travel long distances for employment—daycare is

7   unavailable.

8        20.    Our economic limitations, historical inequities and realities, have created

9   a dangerous cycle for our people, with very few Tribal Members pursuing a higher

10  education, which impedes their employment opportunities and ultimately, depresses

11  their standard of living over multiple generations.

12       21.    The Tribe's primary source of non-grant revenue is the Golden Acorn

13  Casino.  However, the casino's success has been very limited by our isolated rural

14  location, the same condition that has caused other rural casinos in the county to close.

15  As a result of the limited success of the casino, the Tribe has been forced to operate

16  less than 350 Class III gaming devices due to the limited revenue received.  The

17  COVID-19 pandemic has even further diminished the income from the casino, and

18  highlighted the Tribe's urgent need to diversify its economy.

19       22.    Those willing to develop projects on the Reservation, given the

20  uncertainties and limited infrastructure are rare, and the types of economic

21  development projects that can succeed on the Reservation are rare.  Those that are

22  consistent with the Tribe's values and policies to engage in economic development

23  that supports renewable energy and self-determination, are even more so.

24       23.    The Tribe has explored various options for economic development, but

25  these opportunities have been hindered by our rural location, few marketable

26  resources, poor access to capital, and limited infrastructure.  These concerns led the

27  Tribe to focus its future on the resources that were existing on the Reservation--

28  nonarable land, sun, wind, and rural location--to pursue economic development.

DOCS 113061-00000011/4349851.8

24.     In particular, the Tribe turned its attention to the one resource in it had in abundance—wind—as a source for economic development.  The Reservation is located at the hub of the area's renewable energy resource zone identified by the Western Governors' Association.  The Tribe developed an Energy Vision to utilize the natural gifts that the Creator has given to the ten Tribe to help benefit the needs of the Campo people for current and future generations in a sustainable and environmentally responsible manner.  The winds that occur along the summit that crosses our land made our lives challenging on the Reservation, but we now see that this challenge could also be solution to our needs.

25.     In 2006, in a lease agreement with a private company, the Tribe commissioned a small (50MW) wind energy project called Kumeyaay Wind on the Reservation.   While the Kumeyaay Wind project showed the viability of wind generation from the Reservation lands, it has not been a financial boost for the Tribe. Of the net revenue created by the project, only 20% goes to lease payments to the Tribe, with much of the remainder going to Lessee's federal, state and local personal property and income taxes.  When constructed, Kumeyaay Wind also did not have the benefit of a connection to the larger southern California grid, as the Sunrise Powerlink had not yet been constructed.

26.     In 2007, the Tribe began planning expansion of the Kumeyaay Wind project in the context of a larger, more comprehensive plan for the Reservation that blends development of the wind resources and other community goals.  The then-proposed Kumeyaay Wind II project was designed to use the Tribe's *long-term energy vision* is to maximize the development of its wind resources in a manner that sustains and enhances the community environmentally, culturally, socially and economically. While that project was thwarted as discussed in more detail below.  it was through this vision and planning process that the current wind project arose.

27.     The current renewable energy project to be constructed by Terra-Gen Development Company, LLC (the "Project") is unique in that it is one of the few

6

DECLARATION OF MARCUS CUERO IN SUPPORT OF
CAMPO BAND OF DIEGUENO MISSION INDIANS' MOTION TO DISMISS
CASE NO. 3:20-CV-02343-JLS-DEB

DOCS 113061-00000011/4349851.8

economic development projects where the Reservation's rural location is an asset, not an impediment to its success, and is a project that aligns with the Tribe's values and renewable energy policies.

28.     The General Council, as a whole, reviewed and approved pursuing the Project, taking into consideration the benefits to the Tribe's short-term and long-term economic development goals, and its goals of maximizing the development of its wind resources in a manner that sustains and enhances the community environmentally, culturally, socially and economically (the Tribe's *energy vision*), as well as the potential impacts the Project would have on the Tribe and the Tribal community.

29.     After extensive discussions and negotiations, recognizing the opportunities and benefits the Project would provide to the Tribe, the General Council of the Tribe approved the agreement with Terra Gen for the Project, and the 25-year lease with Terra-Gen for the Project (the "Lease") on April 3, 2018 by adopting General Council Resolution No. 04-03-2018-01.

30.     Because the Project is located on trust land, the Lease was submitted to the Bureau of Indian Affairs ("BIA") for review in accordance with 25 U.S.C. § 415 and 25 C.F.R. Part 162 ("Leasing Regulations").  The BIA's review was for purposes of determining compliance with Federal law, including the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4347, and the Leasing Regulations.  In determining whether to approve a lease under the Leasing Regulation, the BIA must ensure compliance with factors established by Federal law.  In the process, and consistent with tribal sovereignty and self-governance, BIA defers to the Tribe's determination that the Lease is in their best interest.

31.     After the BIA reviewed the Lease for compliance with the Leasing Regulations, the BIA undertook an extensive environmental review and published a Draft Environmental Impact Statement ("EIS"), and thereafter a Final EIS, under NEPA.  The BIA also hosted public meetings and responded to public comments on the Draft EIS and Final EIS, and on April 7, 2020, the U.S. Department of the Interior's

7

DOCS 113061-00000011/4349851.8

DECLARATION OF MARCUS CUERO IN SUPPORT OF
CAMPO BAND OF DIEGUENO MISSION INDIANS' MOTION TO DISMISS
CASE NO. 3:20-CV-02343-JLS-DEB

Assistant Secretary for Indian Affairs signed the Record of Decision ("ROD") authorizing BIA approval of the Lease, and then approved the revised and restated Lease between Terra-Gen and the Tribe on May 4, 2020. The ROD documented BIA's compliance with NEPA.

32.    The Project will develop and diversify the Tribe's economy and generate significant economic benefits for the Tribe, including jobs for Tribal Members, and a consistent revenue source for its General Welfare Programs derived from payments and rents under the Lease.

33.    The Lease provides for various payments to the Tribe for the use of its land to construct, maintain and operate the Project. The Tribe has already begun realizing and relying on the benefits of the Project, including interim payments, a scholarship program, and job opportunities.

34.    To date, the Tribal government has received over a million dollars as a result of the Lease in the form of direct rents and payments. This income has been used to provide general welfare benefits under the Tribe's General Welfare Ordinance, which has proven to be especially critical during the COVID-19 pandemic. An additional large payment is due to the Tribe in April 2021.

35.    The Project also resulted in a scholarship program in 2019 to pursue higher education and training. To date, 15 scholarships have been issued to Tribal Members.

36.    The Project has resulted in increased job opportunities, employing approximately 14 Tribal Members and providing hundreds of thousands of dollars income to these members in jobs involving the environmental review of the Project, the protection of cultural resources, and other preliminary field investigations to date.

37.    The revenue expected to be generated by the Project will become the primary funding source for the Tribal government. The annual revenue generated from the Project would multiply the Tribe's total annual revenue, enabling the Tribe to fully fund the programs and services under the General Welfare Ordinance, and

8

1    support developing increased infrastructure on the Reservation, and support further

2    economic development ventures.

3         38.    The Project will generate tens of millions of dollars for the Tribal

4    government in rent, royalties, and other payments, including most that will accrue

5    upon project construction and operation.

6         39.    The Project will continue to provide job opportunities for Tribal Members

7    during construction including labor, security and skilled construction work and once

8    the Project is operational including monitoring, management and skilled maintenance

9    jobs.

10        40.    The construction process will also provide ancillary Tribal benefits

11   including development and use of a tribal batch plant, traffic control, temporary

12   housing for workers, licensing of temporary businesses, and project biological and

13   cultural monitoring jobs.   The Lease for the Project requires Terra-Gen to give

14   preference in hiring to Tribal Members related to the Project.

15        41.    The Project will also provide a Fire Protection Plan that will provide

16   funds for firefighting equipment and emergency medical resources, and significant

17   new resources to the Campo Reservation Fire Department to increase its fire and

18   emergency readiness for incidents on and near the Reservation including water tanks

19   for firefighting use.

20        42.    The Lease also provides for an option for the Tribe to purchase the

21   improvements upon the expiration of the 25-year lease term, thus providing

22   sustainable long-term benefits to the Tribe and securing the Tribe's long-term

23   commitment to using its land to generate renewable energy for current and future

24   generations.

25        43.    If the Lease negotiated by the Tribe was overturned, only the Tribe would

26   suffer.  The Tribe would not only lose the current benefits received under the Lease

27   and from the Project, but it would also lose the ongoing rights obtained through the

28   Lease and vested with BIA's approval of the Lease, including ongoing revenue, the

9

1  governmental services and programs such revenue will support, and the benefits to

2  other economic development ventures of the Tribe.   The Tribe would lose

3  construction, traffic control, monitoring and security jobs, fire and emergency

4  services, increased education opportunities, and all financial support for its general

5  welfare programs including housing, social services, education, meals, water and

6  utility programs, elder programs, cultural education and development, and health and

7  welfare programs.

8       44.   If the Project decision by the Tribe was overturned, it would also deter

9  ongoing potential business interests from transacting with the Tribe, as they could be

10  concerned that the Tribe is not provided the opportunity to self-govern, and make its

11  own business decisions.

12       45.   The Reservation is located in a remote area in eastern San Diego County,

13  at least 50 miles from job centers, which has made it difficult for the Tribe to build

14  any type of sustainable and diversified economy to provide employment opportunities

15  or support the community and tribal government operations.

16       46.   In addition to the barriers and impediments to economic development

17  discussed above, the COVID-19 pandemic continues to hinder potential economic

18  development.  As a result, the Tribe does not have any other projects in the short term

19  that could replace the income received, and to be received, from the Project.  If the

20  Plaintiffs succeed in invalidating the Lease, this will harm the Tribe's economic and

21  sovereign interests, its use of its property, and its control of its resources, including

22  pursuing its Energy Vision.

23       47.   The Tribe has previously explored various options for economic

24  development, but such opportunities have been hindered by our rural location, access

25  to capital, limited infrastructure, and local opposition.  The Tribe, for example, has

26  tried to use its limited resources (i.e., nonarable land, sun, wind, and rural location) to

27  pursue economic development such as a landfill project (twice), wind projects, water

28  sale to local utility providers, and additional gaming ventures, but these projects have

10

1    been thwarted by the same opposition as those attempting to stop the current wind

2    Project.

3         48.    In the 1990s, the Tribe was unified in support of development of a landfill

4    to use their nonarable land for an economic development purpose and developed its

5    own environmental programs to regulate a new landfill project, only to be frustrated

6    at every turn by the neighbors in opposition, who called themselves "Backcountry

7    Against Dumps." This group began a process circulating "BAD Newsletters" within

8    the Tribal community and surrounding community, stating misinformation and

9    opposition to tribal development activities, a process that continued for nearly 20

10   years. The story of that frustrating process was later documented in a 1995 book called

11   "The Campo Landfill War" by Dan McGovern, former US Environmental Protection

12   Agency Region 9 Administrator.

13        49.    Ten years later, the Tribe tried a second time to develop a similar land fill

14   on the Reservation that completed all of the environmental review while being

15   continuously hounded by Backcountry Against Dumps, which stated repeatedly that

16   they would support any other projects by the Tribe, just not a landfill. The project

17   ultimately failed due largely to a significant misinformation campaign and frustrating

18   the economic partner for the project.

19        50.    In the late 1990's the Tribe sought to take advantage of Tribal gaming

20   opportunities (which was also opposed by Plaintiffs). While the Tribe was able to

21   open the Golden Acorn Casino in 2001, it has had limited success.

22        51.    In 2005, the Tribe turned to its other resource in abundance—wind—as a

23   source for economic development. As noted above, the Tribe developed an Energy

24   Vision to utilize the natural gifts that the Creator has given to Campo to help benefit

25   the needs of the Campo people for current and future generations in a sustainable and

26   environmentally responsible manner. In 2006, in a lease agreement with a private

27   company, the Tribe commissioned a small (50MW) wind energy project called

28   Kumeyaay Wind on the Reservation. This project was also contested by Backcountry

11

DECLARATION OF MARCUS CUERO IN SUPPORT OF
CAMPO BAND OF DIEGUENO MISSION INDIANS' MOTION TO DISMISS
CASE NO. 3:20-CV-02343-JLS-DEB

DOCS 113061-00000011/4349851.8

1   Against Dumps.

2        52.    While the Kumeyaay Wind project showed the viability of wind

3   generation from the Reservation lands, as noted above, it has not been a significant

4   financial boost for the Tribe.

5        53.    In 2007, the Tribe began planning expansion of the Kumeyaay Wind

6   project in the context of a larger, more comprehensive plan for the Reservation that

7   blends development of the wind resources and other community goals.  The Kumeyaay

8   Wind II project was designed to use the Tribe's *long-term energy vision* is to maximize

9   the development of its wind resources in a manner that sustains and enhances the

10  community environmentally, culturally, socially and economically.

11       54.    In preparing for the Kumeyaay Wind II project, the Tribe selected and

12  worked with a private partner for years in developing the necessary environmental

13  studies, permitting and clearances; testing of wind speed and direction for turbine size

14  and efficiency; engineering and design drawings for site layout; developing

15  transactional documents between the participants (power purchase, interconnection

16  and build-own transfer agreements); gaining California Public Utilities Commission

17  (CPUC) and BIA approvals; financing agreements; developing a Tribal Energy

18  Resource Agreement (TERA) for environmental and leasing authority; cooperative

19  agreements with state and local governments; land use and master plan amendments,

20  business, job-training and operational and maintenance planning.  Throughout that

21  process, Backcountry Against Dumps sought to stop the project and preclude the Tribe

22  from developing its wind energy.  Once again, the project ultimately failed due largely

23  to a significant misinformation campaign and frustrating the economic partner for the

24  project.

25       55.    When the Tribe sought to gain some temporary governmental income by

26  selling water to a large utility project that was being constructed near the Reservation,

27  the sale was once again opposed by Backcountry Against Dumps which sought to

28  frustrate the Tribe's opportunity.  The constant opposition by these individuals to

DOCS 113061-00000011/4349851.8

1   prevent tribal economic development on the Reservation has kept the tribal community

2   in a state of poverty and despair by opposing each economic development project and

3   seeking to intimidate the Tribe and its partners to preclude our opportunities.

4          56.    Notwithstanding the opposition the Tribe has faced, the Tribe has been

5   determined and resilient, and is hopeful the Project will prove to be a successful step

6   in realizing the Tribe's Energy Vision.

7          57.    At no time has the Tribal General Council, or any of its subordinate

8   entities, officers or employees, ever expressly waived the Tribe's sovereign immunity

9   over the claims asserted by petitioner in their Complaint.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

13

DECLARATION OF MARCUS CUERO IN SUPPORT OF
CAMPO BAND OF DIEGUENO MISSION INDIANS' MOTION TO DISMISS
CASE NO. 3:20-CV-02343-JLS-DEB

DOCS 113061-00000011/4349851.8

1   I declare under penalty of perjury under the laws of the United States that the

2   foregoing is true and correct.

3   Executed this 3rd day of March, 2021, at San Diego, California.

4

5   Marcus Cuero, Chairman

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

14

DOCS 113061-00000011/4349851.8